PEOPLES GAS & ELECTRIC COMPANY et al., Appellees, v. STATE
TAX COMMISSION, Appellant.

No. 46987.

SEPTEMBER 16, 1947.

REHEARING DENIED DECEMBER 19, 1947.

Robert L. Larson, Attorney General, Henry W. Wormley, Assistant Attorney General, W. B. Sloan, and J. M. Barrett, both of Des Moines, for appellant.

Smith & Beck, of Mason City, and Lane & Waterman, of Davenport, for appellees.

OLIVER, C. J.—Plaintiff Kansas City Power and Light Company owned and plaintiff Peoples Gas & Electric Company operated a powerhouse and electric generating plant at Mason City, with connected lines furnishing electricity in said city and to several adjacent industrial plants, and to an electric railway, and in or to thirteen neighboring towns; also about six hundred twenty-five miles of rural lines serving about sixteen hundred rural customers in five counties in northern Iowa. They also owned and operated a gas system furnishing natural gas in six of said cities and towns and certain suburban districts.

Defendant Commission levied the two per cent use tax upon numerous items of industrial materials and equipment purchased by plaintiffs outside of Iowa and used in said utilities between April 1937 and April 1941. Plaintiffs appealed to the district court, which reversed the assessment upon many items and affirmed upon others. The Commission has appealed to this court from the part of the decree which reversed the assessment upon most of the items. Plaintiffs have not appealed from the affirmance upon the other items.

 I. The use-tax law is supplementary to the sales-tax law. It indirectly taxes sales by taxing use. It serves not only to produce revenue but also to protect Iowa dealers by placing them on a tax equality with out-of-state vendors whose sales are not subject to a two per cent sales tax. Dain Mfg. Co. v. Iowa State Tax Comm., 237 Iowa 531, 22 N. W. 2d 786; State Tax Comm. v. General Trading Co., 233 Iowa 877, 10 N. W. 2d 659, 153 A. L. R. 602. In the language of Nelson v. Sears, Roebuck & Co., 312 U. S. 359, 363, 61 S. Ct. 586, 588, 85 L. Ed. 888, 132 A. L. R. 475:

"It is one of the well-known functions of the integrated use and sales tax to remove the buyers' temptation 'to place their orders in other states in the effort to escape payment of the tax on local sales.'"

This out-of-state buying to escape the sales tax was harmful to Iowa sellers and to the sales tax. The principal purpose of the enactment of the use-tax law was to remedy this evil. Protection of the Iowa seller is in fact protection of the sales tax. If he is forced out of business or deprived of part of his business by the imposition of a tax that does not reach his out-of-state competitors, the revenue is lost to the state of Iowa.

Of course, the Iowa user or consumer may purchase outside the state if he so desires. The use tax is not a penalty upon such purchases. It does not even place them at a tax disadvantage. It merely makes them subject to an equal tax.

The two acts are designed to reach all retail sales to Iowa consumers or users (with certain specified exceptions) with a tax measured by two per cent of the sale price. The tax is

paid by the consumer or user but the retailers are made the collectors of the tax under the sales-tax act, and, insofar as possible, under the use-tax act.

■ II. The use-tax law, enacted in 1937, is now chapter 423, Code of Iowa, 1946. Code section 423.2 provides in part:

"An excise tax is hereby imposed on the use in this state of tangible personal property purchased * * * for use in this state, at the rate of two percent of the purchase price."

This language is broad and unlimited. It comprehends all tangible personal property purchased at any place for use in Iowa. However, the scope of the section is restricted by exemptions and exceptions in various other sections of the chapter. Section 423.1, entitled "Definitions," states that:

"1. 'Use' means and includes the exercise * * * of any right * * * over tangible personal property incident to the ownership * * * except that it shall not include processing * * * Property used in 'processing' * * * shall mean and include * * * (c) industrial materials and equipment, which are not readily obtainable in Iowa, and which are directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail."

Plaintiffs contend that, by virtue of the foregoing provision, the materials and equipment in question were property not subject to use tax. They assert the expression, "except that it [use] shall not include processing," is a want of coverage of property so used, rather than an exemption from coverage, and that the above-quoted parts of "Definitions," section 423.1, should be strictly construed against the tax. Our decisions involving the construction of other statutes, comparable in form, do not support this conclusion.

The 1937 sales-tax act changed the "Definitions" section of the 1934 act by adding a processing exception (similar to parts of section 423.1) and by adding also, "* * * but does not include commercial fertilizer * * *." Section 422.42(3), Code, 1946. Kennedy v. State Board of Assessment and Re-

view, 224 Iowa 405, 409, 276 N. W. 205, 207, points out that this exempted commercial fertilizer, not theretofore exempted, and states: "Taxation is the rule, not the exception."

Eddington v. Northwestern Bell Tel. Co., 201 Iowa 67, 72, 202 N. W. 374, 377, states the polestar of construction of any statute is "* * * that the *rule* is broader than the *exception;* that the exception is specific, rather than general; and that, therefore, doubts and implications should be solved in favor of the rule, rather than of the exception."

Garrison v. Gortler, 234 Iowa 541, 548, 13 N. W. 2d 358, 361, and Heiliger v. City of Sheldon, 236 Iowa 146, 153, 154, 18 N. W. 2d 182, 187; involve the construction of parts of a "Definitions" section of the Workmen's Compensation Law. That section, Code, 1946, section 85.61(2), (3), defines workman or employee, "* * * except as hereinafter specified," and then specifies, "The following persons shall not be deemed 'workmen' or 'employees'." Both decisions refer to this as a statutory exception which should be strictly construed so as not to encroach unduly upon the general statutory provision to which it is an exception.

In Wood Bros. Thresher Co. v. Eicher, 231 Iowa 550, 562, 1 N. W. 2d 655, exceptions to the general statute were likewise strictly construed.

Chapter 437, Code of 1946, deals with the assessment of electric transmission lines. Section 437.1, entitled, " 'Company' defined," states it includes any association, corporation, etc. (except co-operative associations, etc.). This exception provision was considered in Greene County Rural Elec. Co-Op. v. Nelson, 234 Iowa 362, 365, 366, 12 N. W. 2d 886, which states it is familiar doctrine that the section must be strictly construed in favor of the taxing body and against those claiming exemption from taxation.

The rule of strict construction against exemptions was applied in Hale v. State Board of Assessment and Review, 223 Iowa 321, 271 N. W. 168, affirmed 302 U. S. 95, 58 S. Ct. 102, 82 L. Ed. 72, in which the taxpayer claimed exemption from income tax of interest on municipal securities under statutes providing that such securities should not be taxed.

Plaintiffs rely in part upon a statement in Palmer v. State Board of Assessment and Review, 226 Iowa 92, 93, 283 N. W. 415, 416, that, if subject to construction, a certain section (6943-f8, Code of 1935, " 'Gross Income' defined—exceptions") should be construed strictly against the taxing body. The reference in that statement to the (entire) section was inadvertent and the statement should have been expressly limited to subsection 1 of said section, theretofore quoted, which defines gross income by listing the items included in the term. Subsection 2, which exempts a list of items not included in the term "gross income," was not set out at length and was not under consideration at that point in the Palmer case, and the statement was not intended to refer to it nor to subsequent subsections. As thus clarified the statement in the Palmer case is not contrary to the doctrines of the other cited decisions.

In the case at bar the general provision (section 423.2, Code of 1946) imposes the tax upon the use of all tangible personal property purchased for use in Iowa, and the language in section 423.1 here in question excepts or exempts some materials and equipment made subject to the tax by such general statutory provision. Hence, where construction is proper and necessary, such language in section 423.1 should be strictly construed against the taxpayer.

III. The administrative division of the income, corporation, and sales-tax law is made a part of the use-tax law by section 423.23, Code of 1946. Both laws are administered by Iowa State Tax Commission.

In October 1937, shortly after the act took effect, the Tax Commission adopted certain interpretations of the use-tax act referred to in Dain Mfg. Co. v. Iowa State Tax Comm., supra, 237 Iowa 531, 22 N. W. 2d 786. In March 1942 the Commission promulgated Rule 172, which in some respects conflicts with the 1937 interpretations. In the Dain case the record was made by stipulation and merely set out the 1937 interpretation and Rule 172. Under such record it was fair to conclude that the Commission had followed the early interpretations until Rule 172 was adopted. The record in the case at bar is materially different. It shows the Commission had never fol-

lowed and applied the 1937 interpretations and that at all times and in every case to which it was applicable (with perhaps one exception) the use-tax law had been administered by the Commission in accordance with Rule 172, which was later formally promulgated.

Rule 172 and more than one hundred printed pages of other rules and regulations for the sales and use taxes were prescribed by the Commission under the express authorization of Code section 422.61. Although stability in such rules and regulations is desirable, it does not follow that they may not be changed or corrected by the Commission. Where Commissions are required to administer laws in new fields, such changes are not unusual. See Boyer-Campbell Co. v. Fry, 271 Mich. 282, 260 N. W. 165, 98 A. L. R. 827. Moreover, it appears from the record that Rule 172 represents a recognition of regulations which previously had been generally followed, rather than a contemporaneous change in interpretation.

IV. Unless the materials and equipment purchased outside of Iowa and used by plaintiffs were within the exception of "processing", as defined in section 423.1, the same were subject to the use tax. One essential element of this definition is the same be "not readily obtainable in Iowa." The legislature did not enlarge upon the expression "not readily obtainable in Iowa." It is fair to infer it deliberately refrained from so doing, concluding that the legislative intent could best be expressed by general language, the applicability of which to specific cases would depend upon their circumstances.

Indicative of this legislative purpose and plan is section 422.61 which empowers the State Tax Commission to prescribe all rules and regulations not inconsistent with the provisions of the chapter, necessary and advisable for its detailed administration and to effectuate its purposes.

The legislature indicated its will and gave to the administrative body, which was to act under such general provisions, power to fill in the details by the establishment of administrative rules and regulations. See State v. Manning, 220 Iowa 525, 531, 532, 259 N. W. 213. Vilas v. Board of Assessment & Review, 223 Iowa 604, 619, 273 N. W. 338, 346, considers the

language of section 422.61 (in an earlier statute, section 6943-f55, Code of 1935) and states:

"The rates are fixed by the legislature, the board merely determines when an individual comes within the classes prescribed by the legislature as being taxable under said rates."

When a statute is ambiguous a long-continued practical construction placed upon it by the department of government charged with its enforcement is entitled to substantial weight. 50 Am. Jur., Statutes, section 309. However, the language now under consideration is not ambiguous in the sense that its meaning is doubtful. There was no failure on the part of the legislature to clearly express its intent. It merely elected to do so by general language and to charge the Commission with the duty of promulgating rules and regulations which would operate in the range of the legislative purpose and design.

This court considered the language of section 422.61 (in the former statute) in Sandberg Co. v. State Board of Assessment & Review, 225 Iowa 103, 108, 278 N. W. 643, 646, 281 N. W. 197, and stated, with reference to the Tax Commission Rule 19, relative to the retail sales tax upon shoe repairing:

"We are of the opinion that rule No. 19 is as fair, reasonable, and practicable as can be formulated, when applied to the vocation of shoe repairing. * * * When the business is considered as a whole, from the standpoint of administration under the law, the details of which, under the statute, are left to the board, we are inclined to agree with the trial court that rule No. 19 is reasonable and practicable and is not in contravention of the statute and hence is valid."

Kistner v. State Board of Assessment and Review, 225 Iowa 404, 415, 416, 280 N. W. 587, 593, which considers the same language, points out that the right to make rules and regulations is limited to such rules as carry out the provisions of the act, and holds Rule 49 is a reasonable rule passed for such purpose and hence is valid.

In Rule 172 the Commission's interpretation of the expression "not readily obtainable in Iowa" is summarized as follows:

"Quantity available, price element, or purchaser's preference for a particular brand or manufacture are not proper factors in determining the 'readily obtainable' question."

We have already referred to section 422.61, which empowers the Commission to make rules not inconsistent with the act, necessary and advisable for its detailed administration and to effectuate its purposes. Sandberg Co. v. Board, supra, 225 Iowa 103, 278 N. W. 643, 281 N. W. 197, holds considerations of administration will be kept in view in the examination of such rules to determine if they contravene the statute. As stated in that case, the rule should be "reasonable and practicable."

Thus, insofar as the proposition of "not readily obtainable" is covered by rule, the problem concerning it is not, strictly speaking, one of statutory construction. The question is whether the rule is reasonable, practical, and necessary to effectuate the purposes of the act—bearing in mind it is a revenue act designed to supplement and to protect the sales tax by removing any incentive to purchase outside Iowa to escape such tax and that one of its principal purposes is to protect Iowa dealers by placing their sales upon a tax equality with those of outside competitors.

As a matter of fact, the Commission formulated Rule 172 in view of these very considerations, stating therein:

"The Personal Property Use Tax Law, in addition to being a revenue law, is intended to serve as a complementary statute to our Retail Sales Tax Law, thereby placing the Iowa retailer selling tangible personal property in this state on a fair competitive basis with the out-of-state seller making sales for delivery in Iowa, insofar as the excise tax is concerned."

The materials and equipment which the trial court held not readily obtainable in Iowa may be placed in various classes, based upon the circumstances surrounding their purchase. They

are so grouped in the briefs and placed in separate divisions or propositions and will be thus considered.

V. Proposition 2 refers to two relatively minor items purchased outside the state which the record indicates were then actually stocked in Iowa by dealers. The case involves numerous items, the purchase price of which amounted to several hundred thousand dollars, and the record relative to those two items may have been overlooked. In any event, they present no problem since they were clearly readily obtainable in Iowa.

VI. Proposition 4 concerns out-of-state purchases where the identical product was not readily obtainable in Iowa but where comparable property was so obtainable.

Example: Plaintiff purchased insulators outside the state. Comparable insulators were stocked in Iowa.

This proposition is covered by the provision in Rule 172 of the Tax Commission that the purchaser's preference for a particular brand or manufacture is not a proper factor in determining the readily obtainable question. It is clear this provision of the rule is designed to effectuate the purpose of the statute to protect Iowa retailers. Protection of Iowa dealers means full protection, which includes protection from arming out-of-state sellers of *competitive equipment* with a two per cent advantage.

We determined the converse of this proposition in Dain Mfg. Co. v. Iowa State Tax Comm., supra, 237 Iowa 531, 22 N. W. 2d 786, aside from the rule. In that case the goods readily obtainable in Iowa were not of equal quality or were not of equal precision standard. We there stated an article is not readily obtainable in Iowa unless it can be procured in kind and quality fairly equivalent to the article purchased outside. The provision of Rule 172 concerning purchaser's preference for a particular brand or manufacture is not contrary to this statement. It is applicable only to goods fairly equivalent in kind and quality. The burden is upon the taxpayer to prove they are not. The record here contains no such showing. Hence, these out-of-state purchases were not exempt from the use tax.

VII. Plaintiffs' purchases were made through a purchasing agent who represented a number of utilities associated

in a purchasing group. Many purchases were made in large quantities to secure quantity prices and carload freight rates. In some instances orders were accumulated and carload shipments were pooled among various utilities. Plaintiffs themselves were large users of various materials and equipment.

Proposition 3 deals with materials and equipment purchased outside of Iowa when regular Iowa dealers had such materials and equipment in stock but not in the quantity ordered.

Example: Plaintiffs bought outside of Iowa copper wire of a certain size in lots of about forty thousand pounds. This wire was regularly handled by Iowa dealers but the quantities in stock in Iowa were less than these lots.

Proposition 5 refers to materials and equipment handled regularly by Iowa dealers as a normal part of their business but which were temporarily out of stock.

Example: Plaintiffs ordered thirteen transformers from the Davenport branch of General Electric Company. Ten were shipped to plaintiffs from the Davenport warehouse. The sales tax was paid on these. This temporarily exhausted the Iowa stock. The remaining three transformers were shipped by General Electric Company to plaintiffs from Pittsfield, Massachusetts. Plaintiffs refused to pay the use tax on these three.

It may be observed that plaintiffs' purchases from General Electric Company were usually made by order given the Davenport branch office of General Electric Company. This office operated the Iowa warehouse, had three suboffices in other Iowa cities, employed a number of resident technical engineers and salesmen, and supervised and handled the orders of various Iowa apparatus agents and dealers. Plaintiffs paid the sales tax on such parts of their orders as were filled from the Davenport warehouse but contend such parts as were shipped them from warehouses outside the state were not readily obtainable in Iowa within the use-tax-law definition. They make the same contention relative to purchases from Westinghouse Manufacturing Company, which company kept no stock in Iowa but maintained a sales organization with an office in Davenport, to which plaintiffs' orders were usually given.

Proposition 6 refers to materials and equipment not manufactured or stocked in Iowa which were of a character not to be regularly stocked in Iowa but which were regularly sold by Iowa dealers as a normal part of their business.

Example: Western red cedar electric poles are produced in Canada and northwestern United States and placed in a few concentration yards where they are given final treatment. Various Iowa dealers regularly sell such poles but do not stock them because the relatively heavy handling charges, freight charges, and small margin of profit practically forbid. It is the practice to handle them on a direct-shipment basis from a concentration point in carload lots. A similar situation exists with reference to wrapped steel pipe, used in gas-distribution systems, which is regularly handled by Iowa dealers on a direct-shipment basis as a normal part of their business.

Proposition 7 deals with materials and equipment not stocked in Iowa, when factory branches, resident agents or salesmen, or jobbers or dealers in Iowa were regularly engaged in selling the same or comparable materials and equipment in Iowa as a normal part of their business.

Example: An Iowa dealer or agent handles the line of a manufacturer or wholesaler as a normal part of his usual business but does not stock it, or stocks only such parts of it as move readily, and handles orders on a direct-shipment basis.

Rule 172 of the Commission provides that quantity available is not a proper factor in determining the readily obtainable question. This has reference to stock, if any, physically present in Iowa, and is applicable to the various propositions stated in this division. Is this provision of Rule 172 reasonable, practical, and designed to effectuate the purpose of the act? If the use-tax act was enacted to protect Iowa stocks, the answer might well be in the negative. But the use-tax act was not designed to protect Iowa stocks. All authorities agree it was designed to protect the Iowa retailer. If the Iowa retailer regularly sells in Iowa (in whole or in part) from a stock pile outside of Iowa, such sales are subject to the Iowa sales tax. It matters not whether such sales are made from his own stock pile or that of another. In either event they are subject to the sales-

tax act. The use-tax act was designed to give him as much protection against ruinous competition from out-of-state sellers with a two per cent advantage as any other Iowa retailer. The failure to tax such purchases would drive such retailers out of business and thus open loopholes in the sales tax which the use-tax act was designed to plug.

It was the duty of the Commission to formulate rules and regulations which would make the act workable from an administrative standpoint. This necessarily involved a comprehensive investigation of the nature of the goods sold by Iowa retailers and the manner in which they conducted their business. This court has not had the advantage of such over-all study and practical experience. The rule-making required the solution of various administrative problems with which the Commission was more conversant than the courts. We should not interfere with the Commission's solution of such problems if reasonable and not in contravention of the statute.

 We conclude the Commission's rules and regulations relative to ready obtainability, under the record in this case, are reasonable, practical, and necessary to effectuate the purpose of the use-tax act and hence not inconsistent with its provisions, and that such rules and regulations are within the meaning of the phrase "not readily obtainable in Iowa" as that meaning is indicated by the legislative purpose to protect Iowa retailers. Hence, we hold the materials and equipment referred to in propositions 3, 5, 6, and 7 were not within the exception "not readily obtainable in Iowa."

This holding is limited to materials and equipment sold by regular Iowa dealers as a normal part of their usual business. Such holding is not contrary to Dain Mfg. Co. v. Iowa State Tax Comm., supra, 237 Iowa 531, 536, 537, 22 N. W. 2d 786, 790. In that case the record showed merely that there was a person, firm, or corporation in Iowa that could have ordered the goods, etc. We there pointed out:

"There is no showing here that the 'person, firm or corporation' which stood ready to furnish an order was a regular dealer in goods of a comparable kind * *.*."

We stated also, "Our holding here is, of course, confined only to the facts as stipulated."

The factual showing in the case at bar is essentially different.

■ VIII. Plaintiffs' proofs showed certain cast-iron pipe used for gas distribution was not handled by Iowa dealers. Hence, it was "not readily obtainable in Iowa."

■ IX. To obtain exemption from the use tax for materials and equipment plaintiffs were required to prove not only that the same were not readily obtainable in Iowa but also that they were "directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail." Code section 423.1(1c).

We have held the generation of electricity to be manufacturing. State ex rel. Winterfield v. Hardin County Rural Elec. Coop., 226 Iowa 896, 285 N. W. 219. The Commission concedes the equipment and materials purchased for the power plant and directly used in generating electricity would be directly used in manufacturing. The issue at this point involves only the electric distribution system.

A witness for plaintiffs testified:

"The essential function of an electric distribution system is to take electrical energy from the source at which it is produced, or supplied, to a given area, to take it to the place where it is delivered to the retail customer who will use it."

It is not economically practicable to conduct electrical energy very far at low voltages. It leaves the plant over transmission lines which carry high voltages. At distribution points such as cities, towns, and industrial plants this transmission voltage is usually stepped down to distribution voltage, and finally, at or near places of use, to the proper voltage for domestic or other uses.

This is accomplished by transformers which decrease the voltage (pressure) and which correspondingly increase the amperage (strength of flow). Transformers are used also to step up voltage. Witnesses for plaintiffs testified transformers

use the electric energy which flows into them to generate a new supply of electric energy of the same amount but with different characteristics. Hence, plaintiffs contend the process of manufacturing electricity continues throughout its transmission until it passes through the last transformer before it reaches the customer. Plaintiffs quote at length from Curry v. Alabama Power Co., 243 Ala. 53, 8 So. 2d 521. Plaintiffs also state: "The process of generation and distribution cannot be divided or separated, for without either the other fails."

In Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038, the court held a license tax by a state upon electricity generated therein and transmitted to and distributed in other states was not invalid under the commerce clause of the constitution. The decision points out that what constitutes manufacture must be determined upon practical considerations, and that while the generation and transmission of electricity are substantially instantaneous, they are essentially separable and distinct operations.

Forrester v. North Georgia Electric Membership Corp., 66 Ga. App. 779, 19 S. E. 2d 158, held a corporation which merely transformed and distributed electricity was not engaged in the production or development of electricity so as to exempt it from taxation.

Kentucky Elec. Co. v. Buechel, 146 Ky. 660, 143 S. W. 58, 38 L. R. A., N. S., 907, Ann. Cas. 1913C, 714, held poles, wires, etc. of an electric company were not used in the manufacture of electricity so as to exempt that portion of its property from taxation.

The Iowa legislature has recognized that distribution may be separated from the manufacture of electricity in statutes empowering municipalities to purchase electricity and erect and maintain transmission lines for the sale thereof. See chapter 397, Code of 1946; Central States Elec. Co. v. Randall, 230 Iowa 376, 297 N. W. 804.

The record in this case shows the electricity, when generated at the plant, goes to two buses which are connected on circuits which take the energy out of the station and distribute it. An expert witness for plaintiffs testified:

"A bus * * * is the name for a single set of heavy conductors that serve as a collecting center in the plant, that is, you might say it is sort of a common platform in a factory—everything that is produced in the factory is brought to the platform and then from that platform it is loaded on trucks which take it away."

There are 2,219 transformers in plaintiffs' distribution system. It may be that technically each of these manufactures electric energy and that plaintiffs operated not one but two thousand electric manufacturing plants. But the language of the exception should be strictly construed against the taxpayer and the statute should be viewed from a practical standpoint. Plaintiffs' expert witness referred to the collecting center at the electric plant as a common platform in a factory from which everything produced is loaded upon trucks which take it away. This expresses the situation from a practical standpoint.

As thus considered and strictly construed against the taxpayer the statute requires a holding that the distribution system was not directly used in manufacturing electricity within the meaning of said statute.

Plaintiffs contend also that the distributing system was directly used in servicing the electric energy. Rule 172 of the Tax Commission provides in part:

"The words 'servicing of tangible personal property intended to be sold ultimately at retail' as used in this law, mean something done to the property by a manufacturer or processor during the manufacturing state, which changes it and puts it in shape for distribution and sale.

"This phrase does not mean anything done to the property manufactured, in connection with its distribution and sale after the property shall have been manufactured. It means some act done or performed on the property itself during the manufacturing process."

As applied to the record in this case we think this provision is reasonable and practical and that it does not contravene the statute. Although the word "servicing" has various meanings, the rule of strict construction against the taxpayer war-

rants its construction in connection with the words "fabricating, compounding, and manufacturing," with which it is associated in the processing exception.

Moreover, the legislature said in Code section 423.1(4), that for the purposes of this act electric energy is tangible personal property. As thus considered its distribution may be compared to that of unpackaged commodities loaded upon trucks at the factory and delivered to customers. The transformer may be compared to the knife used to slice off the part of a load for customer use. One who hauls ice and cuts from a block sufficient ice for each householder's needs is not a processor. He merely delivers the ice. His delivery may be termed a service to consumers but he does not service the ice. The ice is transported from the plant in large blocks, and the electric energy is transported at high voltages, not because large blocks or high voltages are usable by consumers but because such methods of transportation are the most practical.

We hold the poles, wires, transformers, and other equipment in the distribution system were not directly used in manufacturing or servicing the electric energy within the meaning of the processing exception. It follows that such materials and equipment were not exempt from the use tax.

X. Plaintiffs do not manufacture gas but own and operate a system of gas mains and pipes through which they distribute natural gas to numerous customers. Plaintiffs purchase this natural gas from a company which operates a pipe line through the territory. At the stations where the gas is delivered to plaintiffs' main by said pipe line, plaintiffs inject into it an odorant at the rate of about one pound per million cubic feet of gas. Plaintiffs receive the gas at relatively high pressures, which are successively reduced at various points in the transmission and distribution mains and pipes. It is delivered to customers at relatively low pressures. In this respect the method of distribution is similar to that used in electric distribution systems. Likewise, it is employed because it is the most practical method of distribution.

Various authorities hold the distribution of gas is not manufacturing. Covington Gas-light Co. v. City of Covington,

84 Ky. 94, 8 Ky. L. R. 442; Consolidated Gas Co. v. Mayor and City Council of Baltimore, 62 Md. 588, 50 Am. Rep. 237; State ex rel. Minneapolis Gaslight Co. v. Lord, 132 Minn. 419, 157 N. W. 638. Plaintiffs do not contend otherwise. They contend the gas distributing system is directly used in servicing the gas.

Our conclusion that the poles, wires, transformers, etc. do not service the electric energy is applicable to this contention and results in a holding that the main pipes, valves, regulators, etc. do not service the gas within the meaning of the processing exception. Hence, such materials and equipment were not exempt.

XI. The briefs refer to a few other items, some of which plaintiffs concede should have been held taxable. The others were not shown to have been not readily obtainable in Iowa and need not be considered from the processing standpoint.

The result of our conclusions, above stated, is that none of the industrial materials and equipment was shown to be exempt from the use tax.—Reversed.

BLISS, HALE, and HAYS, JJ., concur.

SMITH and MANTZ, JJ., dissent.

GARFIELD, J., takes no part.

MULRONEY, J., having been formerly of counsel, takes no part.

WENNERSTRUM, J., absent on leave, takes no part.

SMITH, J. (dissenting)—I disagree fundamentally with much of the reasoning of the majority opinion and would affirm the decision of the trial court.

I. Section 423.1, Iowa Code, 1946, is the first section of chapter 423 devoted to "Use Tax." The pertinent part of it provides:

"423.1 Definitions. The following words, terms, and phrases when used in this chapter shall have the meanings ascribed to them in this section:

"1. 'Use' means and includes the exercise by any person of any right or power over tangible personal property incident to the ownership * * * except that it shall not include processing, or the sale * * * in the regular course of business. Property used in 'processing' * * * shall mean and include * * * (c) *industrial materials and equipment, which are not readily obtainable in Iowa, and which are directly used in the actual * * * manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail.*" (Italics supplied.)

Section 423.2 imposes an excise tax "* * * on the use in this state of tangible personal property purchased * * * for use in this state * * *." I think all the above-quoted language should be strictly construed as a tax law. Section 423.1(1), is not, in form or substance, a tax-exemption statute, but is one predefining and limiting the subject to be taxed.

The majority opinion says the language of section 423.2 which imposes the tax is "broad and unlimited." If there were no subsection 1 of section 423.1, that might be accurately said. But the legislature carefully defines the word "use" before levying the tax upon it. The language of section 423.2 is therefore *not* "broad and unlimited." The word "use" does *not* have an all-inclusive meaning. It has already been limited by the definition. There was never any purpose to tax "use" except such "use" as is defined in section 423.1.

We are apparently agreed the use-tax law (chapter 423, Code, 1946) is a revenue measure designed to supplement the sales-tax law by producing revenue from certain transactions not taxable under the latter. It does incidentally afford Iowa dealers a measure of protection from untaxed competition. Dain Mfg. Co. v. Iowa State Tax Comm., 237 Iowa 531, 22 N. W. 2d 786.

But that incidental or secondary purpose does not divest it of its character as a revenue or taxing law. Even were the secondary purpose "remedial" in character we should still hold the act to be a revenue measure (see Moorman Mfg. Co. v. Iowa Unemployment Comp. Comm., 230 Iowa 123, 296 N. W. 791) and as such subject to the rule of strict construction against the defendant Commission. See, also, Palmer v. State Board of

Assessment and Review, 226 Iowa 92, 94, 283 N. W. 415; Dain Mfg. Co. v. Iowa State Tax Comm., supra; Moorman Mfg. Co. v. Iowa Unemployment Comp. Comm., supra.

This rule of strict construction of tax laws rests upon a fundamental consideration:

"The courts have been most liberal in construing the constitutional extent of the powers of taxation of the states. With the state practically all-powerful in its selection of the subjects of taxation and the amount of tax which shall be levied, the helplessness of the citizen demands, for his protection, that if the Legislature intends to tax him, it shall at least be required to say so, in clear and unmistakable terms." Converse v. Northern Pac. Ry. Co., 8 Cir., N. D., 2 F. 2d 959, 960.

See, also, 61 C. J., Taxation, section 119(b), note 13[a]; 51 Am. Jur., Taxation, section 308 (and cases cited in notes 17, 18), and section 316. The makers of our state Constitution recognized the importance of this when they provided:

"Every law which imposes, continues, or revives a tax, *shall distinctly state the tax, and the object to which it is to be applied * * *.*" Article VII, section 7. (Italics supplied.)

This rule of strict construction is the judicial shield of the taxpayer against administrative oppression beyond the clear intent or permission of the legislature.

It must be remembered that however the statute be construed the burden of proof is still upon the taxpayer to show he is not within its terms. Sections 423.16 and 422.55(3), Code, 1946. This is his burden. That fact perhaps lends emphasis to the necessity for strict construction of the language of the statute under which it is sought to make him liable for the tax.

But it is said section 423.1(1c) provides for an exemption and should therefore be strictly construed against the taxpayer. The contention ignores the very nature of the "exemptions" which are held to be so construable. The term "exemption from taxation" is said to have two meanings, one broad and the other narrow. 51 Am. Jur., Taxation, section 495. The broad definition would make it apply to any freedom from

taxation. In that sense any untaxed property is "exempt."

But in its narrower or technical meaning the term presupposes a liability and a grant of immunity therefrom. 61 C. J., Taxation, section 382. It is said to imply a "grant of immunity, express or implied, to particular persons or corporations, or to persons or corporations of a particular class, from a tax upon property or an excise which persons and corporations generally within the same taxing district are obliged to pay." 51 Am. Jur., Taxation, section 495. It is exemptions in this latter sense that are subject to the rule of strict construction against the taxpayer. The property is not merely *untaxed* but *exempted*.

Code section 423.1(1c) is obviously not a provision of this character. The avowed purpose of all of section 423.1 is to define terms used later in the chapter. Subsection 1 undertakes to define the *thing*—the "use"—that is proposed to be taxed. Clearly, the lawmakers did not start out to tax "uses" as such, but only those uses that represent or result from certain untaxable sales in competition with taxable sales; that is, sales (or purchases) of goods outside the state which, if consummated in Iowa, would be taxable under the Iowa sales-tax law. This statement may not be broad enough to describe every taxable use but it is sufficiently accurate for our purpose here.

The legislature in defining the "use" that was to be taxed found it easier to describe what uses *were not* than to enumerate those that *were* to be taxed. This did not *exempt* the former from the tax in the legal sense. It merely omitted or excluded them from among the uses that were to be taxed, not as a favor to any particular taxpayer or class of taxpayers but because the purpose of the legislature required that the tax be levied only upon certain uses.

The purpose of construction is therefore to determine what uses are to be taxed and what left untaxed. It is a part of the taxing process and doubts should be resolved against the taxing authority. I can see no logic in saying a taxing law must be strictly construed *against*, but that the definition of the thing to be taxed shall be liberally interpreted *in favor of*, the taxing body.

The opinion in Kennedy v. State Board of Assessment and Review, 224 Iowa 405, 408, 276 N. W. 205, 207, cited by the majority opinion, does not discuss the question of strict or liberal construction. The 1937 amendment to the definition section of the sales tax statute had enlarged the "processing" exclusion from taxation by adding thereto sales of commercial fertilizer. The opinion merely says the amendment was a legislative determination that "the original act did not exempt" such sales and that the amendment was not retroactive. The word "exempt" is plainly used in its broad, popular sense and not with any idea of determining whether to apply a rule of strict construction against the taxpayer.

Eddington v. Northwestern Bell Tel. Co., 201 Iowa 67, 202 N. W. 374, involved the Workmen's Compensation Act, which is always construed as remedial and subject to liberal interpretations. It is not in point here where is involved a tax law which must always be strictly construed.

Other cases cited by the majority should be distinguished upon the same principle, e. g., Garrison v. Gortler, 234 Iowa 541, 13 N. W. 2d 358; Heiliger v. City of Sheldon, 236 Iowa 146, 18 N. W. 2d 182; Wood Bros. Thresher Co. v. Eicher, 231 Iowa 550, 1 N. W. 2d 655.

The majority opinion does not cite, nor have I found, any case involving construction of a tax law which holds an exclusionary exception by way of definition to be construable strictly against the taxpayer. In Greene County Rural Elec. Co-Op. v. Nelson, 234 Iowa 362, 366, 12 N. W. 2d 886, 888, we conceded without argument the Tax Commission's demand for strict construction and held the taxpayer met "its requirements." The question there was immaterial for that reason. And in Hale v. State Board of Assessment and Review, 223 Iowa 321, 325, 271 N. W. 168, 170, the real holding is that "The statutory definition of income is clearly broad enough to include the income in question" (interest on nontaxable municipal securities). The only exemption statute discussed was the *general property exemption statute*, section 6944, Code, 1935 (now section 427.1, Code, 1946), which makes untaxable the securities themselves but not the interest from them. Of

course, it was held that statute did not apply to the interest from exempt securities or make such interest exempt from income tax.

The language in Palmer v. State Board, supra, 226 Iowa, at page 94, 283 N. W., at page 416, may have been "inadvertent" and perhaps unnecessary to the actual decision, inasmuch as the statute was held not subject to construction. But it states what I conceive to be the correct principle:

"The reason upon which is founded the rule of construction urged by the appellant, Board of Review, is that a proviso or exemption in any statute in derogation of its general enacting clause must be strictly construed. * * * In the case at bar, however, the claim that the out-of-state rent is nontaxable is not a claim of exception or exemption under a proviso or exemption provision of the statute but is based upon the contention that it was not included in the general provisions of the statute."

So here the uses described in section 423.1(1c) are not included in the uses that are taxed by section 423.2.

II. The majority opinion states that the statute "is not ambiguous in the sense that its meaning is doubtful"; that "there was no failure on the part of the legislature to clearly express its intent"; and that "it merely elected to do so by general language and to charge the Commission with the duty of promulgating rules and regulations which would operate in the range of legislative purpose and design." Does this mean that it is for administrative officials and not the court to define the language "not readily obtainable in Iowa, and * * * directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail"?

In 1937 the Commission interpreted "readily obtainable in Iowa" to mean: "* * * kept in Iowa for sale or manufactured in Iowa for sale as distinguished from being obtainable by giving an order to an agent in Iowa for delivery * * * from some point outside * * *." Under the pronouncement of the majority opinion here would that rule have operated "*in*

*the range of the legislative purpose and design"*? (Italics supplied.) And when in 1942 the Commission adopted an exactly contrary interpretation did it also so operate?

We said in the Dain case, supra, that the earlier interpretation more nearly expressed the legislative intent. Are we now overruling the Dain case or are we saying that it is for the Commission to determine what is "in the range of the legislative purpose and design" and that its decision either way is final?

I cannot subscribe to the theory that the legislature may provide in "general" (i.e., ambiguous) terms for a tax to be levied and may delegate to administrative officials the unlimited power of determining (by rule or regulation) what shall and what shall not be taxed in order to accomplish an assumed purpose. As said in Converse v. Northern Pac. Ry. Co., supra, 8 Cir., N. D., 2 F. 2d 959, 960, it is the duty of the legislature to prescribe "in clear and unmistakable terms" the "subjects of taxation"; or as our Constitution provides: *"distinctly state the tax, and the object to which it is to be applied."* Article VII, section 7. (Italics supplied.)

We have no right to assume here, in the face of this constitutional mandate, that the legislature intended merely to prescribe an elastic *"range of the legislative purpose and design,"* leaving to the tax officials the discretion of determining what use shall be taxed in order best to effectuate the supposed legislative purpose. We should, on the contrary, interpret the language of the statute strictly and so as to require that the tax be applied only to such uses as come *clearly* within it. If this cannot be done we should declare the statute unworkable. See Davidson Bldg. Co. v. Mulock, 212 Iowa 730, 751, 235 N. W. 45.

Of course, it is for the administrative body in the first instance to interpret the law which it must administer. But I am not prepared to concede that such interpretation when made is not subject to judicial review. It is a mistake to characterize the language of the statute above quoted as "general" and subject only to administrative construction by rules and regulations. There is *ambiguity* and it is for the court to determine

under the well-established rules of construction upon what uses the legislature intended the tax to be levied and whether, under the record, the use to which the items in question here were to be put was such use as was intended to be taxed.

III. Over four hundred items of property purchased by plaintiffs-appellees outside of Iowa are claimed by them to have been "not readily obtainable in Iowa" and also to have been "directly used in the actual * * * manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail." Section 423.1(1c). The ultimate products sold by them were electric energy, hot-water heat, and gas. Section 423.1(4) Code, 1946, defines "tangible personal property" to include gas, electricity, and water.

The trial court upheld the Commission's order as to nine items used in furnishing hot-water heat on the ground that heat or the furnishing of heat was not within the definition of "tangible personal property." Plaintiffs have not appealed from this part of the decree and there seems to be no doubt of its correctness. The same principle might also apply to the items used in furnishing street lighting if the electricity is not metered and sold as such but the light furnished and paid for as light. "Light" as such is not included in the definition of tangible personal property any more than is "heat." However, this proposition is apparently not raised and the record does not show the facts as to the basis on which the street lighting is furnished.

Of the remaining items nineteen were held to be readily obtainable in Iowa and ten not directly used in the actual manufacturing or servicing of property for actual retail sale. There is no appeal from this.

Approximately three hundred sixty-eight items were adjudged by the district court to have been bought for nontaxable use. These are the ones in dispute here. The Commission claims the decision is erroneous as to all, some because the material was in fact readily obtainable in Iowa and others because the material was not directly used in preparing property for sale at retail within the meaning of the statute.

It is, of course, impracticable and unnecessary to discuss these items in detail. It will suffice here to consider the general

principles which apply to the several categories into which they fall.

IV. Appellant urges various propositions as grounds for reversal involving the question of "ready obtainability." Not all apply to all items but they may be classified into the following categories: (1) Material not stocked in Iowa in the quantity ordered but no good-faith showing of need is made for quantity greater than actually stocked; (2) identical product not obtainable in Iowa but comparable product is so obtainable and there is no showing of material difference; (3) product regularly dealt in by Iowa dealer but temporarily out of stock; (4) material not of a character to be regularly stocked in Iowa but regularly procured and sold by Iowa dealers as part of normal business; and (5) material not regularly stocked in Iowa but handled by factory branches, resident agents, salesmen, jobbers, or dealers as part of their normal business.

I think all these contentions were properly denied upon the considerations hereinafter referred to.

V. Concerning the meaning of "not readily obtainable in Iowa," the trial court properly says:

"I have tried to find an interpretation of these words which would at the same time be (a) within the usual and ordinary meaning of the words used, (b) be within the apparent intent of the Act, and (c) be reasonably susceptible to easy administration. * * * Failing to find such an ideal solution, it is my duty to give the words used their ordinary meaning, and if inconsistent or even ridiculous situations result, the remedy is with the legislature and not in the court."

I would agree in general with the trial court's pronouncement that: "* * * goods are readily obtainable in Iowa when they are usually and ordinarily kept for sale in Iowa in quantities sufficient to meet the usual and ordinary needs of the buyer." They are not readily obtainable in Iowa merely because they can be had by being "ordered from or through an Iowa dealer for delivery from a point without the State."

In other words, "obtainable *in Iowa*" should not be construed to mean "obtainable *outside* Iowa through an agent or

dealer or other middleman," unless some compelling consideration requires such construction. No such necessity is apparent. Assuming, as has been often said, that an important purpose of the legislation is to protect Iowa dealers from competition with outside dealers not burdened by the sales tax, it does not follow that they were intended to be protected when they step into a role of broker, procuring from out the state something they do not carry in stock. The very words of the statute seem to exclude them in such role from its protection. Appellant's 1937 interpretation (already referred to) was sound and should be adhered to.

I would agree, too, with the trial court that in order to be readily obtainable in Iowa the material must be available in quantity sufficient to meet the buyer's reasonable needs but that he may not "avoid the tax by pooling orders or anticipating future needs in order to secure a price advantage."

This proposition was recognized by us in the Dain case, supra, though in that case the plaintiff had not met the burden of proof necessary to bring itself within the statute.

In the Dain case we also said quality could not be disregarded in determining whether the presence in Iowa of other and similar material usable for the same purpose would meet the test of "ready obtainability." In that case it was stipulated that the product obtainable in Iowa was not of quality equal to that of the article purchased outside and therefore did not meet the test.

We did say at page 537 of 237 Iowa, page 790 of 22 N. W. 2d:

"The purchaser's whims or opinion or pretense is not enough. But * * * if proof fairly establishes that there is an actual, material difference between the domestic and the foreign article, the purchaser of the latter is not liable for use tax."

That is perhaps as near an approach to a workable formula as is possible. There are probably in some lines mere differences in brand of article of equal quality and interchangeable in practical use. And again, in other lines, a change of brand or make might necessitate material changes and adaptations in use.

In examining the trial court's analysis of items held not readily obtainable in Iowa we find the question of usability of other items of comparable quality was not a material consideration. No such articles reasonably obtainable in Iowa were involved.

I think the court correctly defined the words "readily obtainable in Iowa" and correctly applied the definition to the various items in question.

VI. The statute excludes from taxation use of industrial material "not readily obtainable in Iowa" *only* when it is "directly used in the actual \* \* \* manufacturing or servicing of tangible personal property intended to be sold ultimately at retail."

I have already indicated approval of the trial court's interpretation of the words "not readily obtainable in Iowa." There remains the further question whether the use of the items in controversy came within the meaning of the last-above-quoted language.

These items consisted principally of poles, wires, transformers, and other equipment used not only in distribution of electric energy to the consumer but also in preparing it for use; and similar or comparable equipment and material used in the processing and distribution of gas to the consumer. The record shows (and it may be said to be a matter of general knowledge) that electricity can only be conveyed or distributed as a practical matter at voltages too great for use by the consumer. The high tension necessary to be generated in order to furnish electrical energy at a point distant from the place of generation must be "transformed" to lower voltage in order to render it suitable for use. Sometimes it must be changed to higher voltage in order to attain the necessary distance to the point where it is to be made usable.

It seems immaterial whether this transmission and transforming operation be called "manufacturing" of new electricity or "servicing" of the original energy. It is in neither case comparable to the use of a knife "to slice off the part of a load (of unpackaged commodity) for customer use" as said by the majority opinion. In fact it has no analogy or reference to *quantity*. It is rather a process necessary in order to change the

1398

nature of the "commodity" or to make it over into a new "commodity" suitable for consumer use. Its connection with the problem of distribution is incidental.

I cannot subscribe to the definition of "servicing of tangible personal property" in the Commission's Rule 172 as quoted by the majority opinion. I find no warrant in the language of the statute for saying that "servicing" must be "something done to the property * * * *during the manufacturing process*" or that it "does not mean anything done to the property manufactured, in connection with its distribution and sale after the property shall have been manufactured." (Italics supplied.) This is not *strict construction* of the statute but amendment and addition to it.

The apparatus and equipment necessary in preparing gas for distribution and use are, in my judgment, analogous to the electric equipment already discussed. As to all these items for servicing gas and electricity for ultimate sale at retail I would uphold the decision of the trial court.

The majority opinion reaches a contrary result by applying the rule of strict construction against the taxpayer. This I believe to be fundamentally wrong.

The difficulties confronting the Commission in administering the use-tax statute should not be minimized. But these difficulties are only multiplied when the language of the law is stretched beyond its reasonable meaning. They should not be made the occasion for doing away with the fundamental safeguards which the courts and our own state Constitution have erected for the protection of taxpayers against administrative zeal in collecting revenue. As said in the Dain case, the law is apparently drawn with the purpose of avoiding double taxation. Use by resale (which would ordinarily be subject to sales tax) and use by "processing" for the production of ultimate sale at retail (also taxable) are carefully excluded from the operation of the act. The sale of products produced and distributed by appellees is subject to the sales tax. There seems no justification in the language of the use-tax act for burdening the industry with further taxation.

I would affirm.

MANTZ, J., joins in this dissent.