CITY OF AMES, appellee, v. STATE TAX COMMISSION of the
STATE OF IOWA, appellant.

No. 48687.

(Reported in 71 N.W.2d 15)

June 7, 1955.

Dayton Countryman, Attorney General, Edward R. Hayes, Special Assistant Attorney General, and James M. Barrett, of Des Moines, for appellant.

R. G. Pasley, of Ames, C. J. Rosenberger, of Muscatine, Whitley Hemingway, of Webster City, and Harold O. Hegland, of Ames, for appellee.

THOMPSON, J.—The litigation under consideration here arises under chapter 423, Code of Iowa, 1950, embodying the Use Tax law. It concerns the power of the Iowa State Tax Commission, hereinafter known as the commission, to levy a use tax upon materials and equipment purchased outside the State of Iowa and used by the plaintiff, City of Ames, hereinafter termed the city, in the construction of a municipal light and power plant. Two appeals are involved. The city's action prayed that certain use tax assessments levied by the commission be canceled. The trial court granted the relief prayed as to what, following the order set out in appellee's brief, we shall designate as Exhibits Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11. From this part of the decree and judgment the commission has appealed. It will be designated as the appellant. The court denied the city's prayer for relief from the assessment against the property described in Exhibit 1, and also held certain freight charges paid by the city were part of the price of goods purchased and so subject to use tax. From this part of the judgment the city, which we shall term the appellee, has appealed.

I. The case as presented to us is replete with difficult questions of law and fact, and the briefs and arguments take a wide range. The essential problem we must resolve is whether the large and expensive items of material used in building and equipping the municipal power plant are properly subject to use tax under the provisions of chapter 423. Two major questions are

involved: (1) were the items involved "industrial materials and equipment, which are not readily obtainable in Iowa"; and (2) were they "directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail?" See Code section 423.1, paragraph 1. Paragraph 4 of the same section provides that " 'tangible personal property' " includes electricity "when furnished or delivered to consumers * * * within this state."

II. Giving attention first to the commission's appeal, and in accord with the two important questions set out above, it is contended by the appellant first that the items of equipment, Nos. 2 to 11 inclusive, found by the trial court not subject to the tax, were in fact readily obtainable in Iowa under the law then applicable. (It should perhaps be noted that the use tax is payable by the user of personal property if it has not otherwise been paid, under the terms of section 423.14 of the Code; and since the tax was not paid by the suppliers who sold the property to the city, with one exception to be noted later, the attempt is to establish the city's liability under the section last cited.) The commission offered no witnesses at the trial, but cross-examined those called by the city at some length. It is now its contention that such cross-examination shows the equipment purchased could have been ordered through factory branches, resident agents or salesmen or jobbers or dealers in Iowa regularly engaged in selling such equipment, either the same or comparable, in the regular course of their business.

This brings into focus one of the vital points in the case. Shortly after the enactment of the use tax law, in 1937 the commission by rule interpreted "readily obtainable in Iowa" as meaning "kept in Iowa for sale or manufactured in Iowa as distinguished from being obtainable by giving an order to an agent in Iowa for delivery of the same from some point outside the state of Iowa." In Dain Mfg. Co. v. Iowa State Tax Comm., 237 Iowa 531, 536, 22 N.W.2d 786, 789, 790, we compared this rule with the later interpretation made by the commission in 1942. The later rule, now a part of rule 172 of the commission, says:

"The commission holds that, where industrial materials and

equipment of the same general classification are offered for sale in Iowa, such material and equipment cannot be considered 'not readily obtainable in Iowa' and therefore would not be entitled to use tax exemption when purchased in interstate commerce from points outside the state."

We then said that in so far as these orders were in conflict, we thought the earlier one more nearly expressed the legislative intent. But the prevailing opinion in Peoples Gas & Electric Co. v. State Tax Comm., 238 Iowa 1369, 28 N.W.2d 799, is thought by the appellant to approve the 1942 version of the rule, and is interpreted as meaning that even though the property is not kept for sale or manufactured in Iowa, if it may be ordered from outside the state through an agency regularly engaged in the state in selling such products, it is "readily obtainable" in Iowa. For the purposes of this discussion we may accept this as the correct interpretation of the opinion in the Peoples Gas case.

Shortly after the decision of the Peoples Gas case, supra, the Fifty-third General Assembly amended the use tax statutes by enacting chapter 193 of its laws. The material parts of this chapter are paragraph 10 of section 2, and section 3, which we set out:

"SEC. 2. Amend section four hundred twenty-three point one (423.1), Code 1946, by adding at the end thereof the following:

"10. 'Readily obtainable in Iowa' shall mean kept in Iowa for sale or manufactured in Iowa for sale as distinguished from being obtainable by giving an order to an agent in Iowa for delivery from some point outside the state of Iowa."

"SEC. 3. The provisions of this act shall be applicable hereafter beginning with the quarter ending June 30, 1949, and every return and payment for said quarter shall be under the provisions of this act."

The quoted part of section 2 now appears as paragraph 10, section 423.1 of the Code.

Chapter 193, supra, contained a publication clause, by virtue of which it became effective on May 26, 1949. It will be observed that paragraph 10 of section 2 of chapter 193, supra, is

in substance, and very closely in language, identical with the rule first adopted by the commission in 1937. It returned the status of the law on this point to the commission's first interpretation, and if the holding in the Peoples Gas case is to be understood as the appellant contends, the rule there approved was changed by the legislative enactment. Chapter 193 was made effective for the quarter ending June 30, 1949; which means beginning on April 1 of that year.

The commission, faced with legislative action interpreting the meaning of "readily obtainable", on February 15, 1950, adopted its rule 172A. After reciting the action of the legislature in enacting chapter 193, the rule states:

"It is the commission's interpretation of the foregoing amendment, that an item is readily obtainable in Iowa, only:

"(a) When normally carried as a stock item in Iowa for sale, irrespective of quantities, or,

"(b). When the item is manufactured in Iowa for sale, irrespective of quantities, or,

"(c) When an item acquired outside of Iowa, but not stocked or manufactured in Iowa, is fairly and reasonably competitive to an item which is stocked in Iowa for sale or manufactured in Iowa for sale."

The rule further says: "When determining whether an item of tangible personal property is or is not 'readily obtainable in Iowa' the facts and the law existing at the time the contract to purchase was made shall govern and not the facts and the law existing at the time the item was delivered into the state of Iowa."

It is the last quoted portion of the rule which the commission relies upon to prove that the equipment used by the city is subject to the use tax because it says it shows the property was readily obtainable in Iowa. Contending the evidence adduced by it on cross-examination of the appellee's witnesses shows the equipment could have been ordered through agents or jobbers or branch agencies in Iowa, it points out that all of the purchase contracts entered into by the city with the suppliers outside the state were made before the effective date of chapter 193, and while the rule of the Peoples Gas case was in effect. Applying its rule 172A to this situation, it urges that the liability to use tax must be determined as of the time of the purchase contracts rather than the

time of delivery. The situation is peculiar in that all of the material and equipment had been contracted for before chapter 193 took effect on April 1, 1949, but with the exception of Exhibit 1, all deliveries were made after that date. (It is of interest to note that nearly all of the equipment described in Exhibits Nos. 2 to 11 inclusive was delivered in Iowa, and so became taxable here, at various dates from six to more than eighteen months after chapter 193, supra, became effective on April 1, 1949.) If, therefore, that part of rule 172A making the time of the contract instead of the time of delivery the determining point on the question is given force, and if the evidence shows there were agencies in the state which could have ordered or did order the same or comparable property, even though from outside the state, the use tax was properly assessed.

The city contends, however, that it is the time of delivery that must govern the assessment of the tax, and that the commission exceeded its powers in enacting that part of rule 172A which attempts to apply the "time of purchase contract" test. With this position we agree.

Section 422.61, made applicable to Code chapter 423 by section 423.23, is here quoted so far as material: "The commission shall have the power and authority to prescribe all rules and regulations not inconsistent with the provisions of this chapter, necessary and advisable for its detailed administration and to effectuate its purposes."

It will be noted that the rule-making power of the commission may not be "inconsistent with the provisions of this chapter." The function of the commission is an administrative one, and it may enact reasonable rules and regulations necessary in carrying out the legislative enactments. But it may not make law, or by rule change the legal meaning of the common law or the statutes. In Kistner v. Iowa State Board of Assessment and Review, 225 Iowa 404, 415, 280 N.W. 587, 593, we said: "The Board does not have the right to legislate, and it is conceded * * * that it has no authority under the statute to adopt rules which are in the nature of laws. It cannot make a retailer out of someone who is not under the act a retailer."

■■ We think it clear that it is the law at the time the property comes to rest in the state and is used here that must govern the question of its taxability. That is the time it first becomes taxable; and the commission does not have the right to say it will look to another and different date and apply a law then in effect, but materially changed before the date of delivery, to determine its tax status. Section 423.2 imposes the tax on the "use in this state." Section 423.1, paragraph 1, defines "use" as meaning the exercise by any person of any right or power over any tangible personal property incident to the ownership of that property. Section 423.5 makes evidence that tangible personal property was sold for delivery in this state prima-facie evidence that such property was sold for use in the state. Thus a showing of a sale made for delivery in the state is evidence of its intended use in Iowa; but it is rebuttable. It cannot be doubted that no tax can be imposed on the sale itself; it is only if the sale is followed by delivery and use here that a use tax may be assessed. Without doubt in many instances goods are ordered from outside Iowa which for various reasons are never delivered. Contracts may be broken, orders may be canceled, many slips may occur between the cup and the lip; and we apprehend no one would contend a use tax will lie if the property is never brought into the state.

In Nelson v. Sears, Roebuck & Co., 312 U. S. 359, 363, 61 S. Ct. 586, 588, 85 L. Ed. 888, 132 A. L. R. 475, the United States Supreme Court said: "Use in Iowa is what is taxed regardless of the time and place of passing title and regardless of the time the tax is required to be paid." In Southern Pacific Co. v. Gallagher, 306 U. S. 167, 177, 59 S. Ct. 389, 393, 83 L. Ed. 586, in answer to the contention that the California Use Tax Act was an improper restriction upon interstate commerce, it was held: "We think there was a taxable moment when the former [articles] had reached the end of their interstate transportation * * *. At that moment, the tax on storage and use—retention and exercise of a right of ownership, respectively—was effective." There is in this case a strong intimation that a tax levied by a state upon sales in interstate commerce rather than upon use after the property reaches its destination would be a transgression upon the Constitution of the United States. So in Henneford v. Silas

Mason Co., Inc., 300 U. S. 577, 582, 57 S. Ct. 524, 526, 81 L. Ed. 814, we find this:

"The tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end.

"Things acquired or transported in interstate commerce may be subjected to a property tax, nondiscriminatory in its operation, when they have become part of the common mass of property within the state of destination. * * * For like reasons they may be subjected, when once they are at rest, to a nondiscriminatory tax upon use or enjoyment."

The commission urges that if it be held to be the rule that the question of "readily obtainable" is to be decided as of the time of delivery in Iowa, the citizen might find that property not obtainable at the time of the purchase order would be obtainable when it was delivered, and so find a tax imposed not contemplated when the goods were bought. This is true; but it does not change the law. In John McShain, Inc. v. District of Columbia, 92 App. D. C. 358, 205 F.2d 882, 883, construction contracts had been entered into prior to the passage of a use tax act. The court held the tax properly imposed, when the goods were delivered after the law came into effect. It said: "The imposition of a new tax, or an increase in the rate of an old one, is one of the usual hazards of business enterprise; seldom, if ever, does such an event impair the obligation of a pre-existing contract." If a harsh or unjust rule results, the law should be changed by the legislature, not by the commission.

It is further contended by the appellant in its reply brief that there is no showing the goods were not manufactured or kept for sale in Iowa at the time of delivery. It overlooks the testimony of R. H. Miller, manager of the Des Moines District of the General Electric Company, that "in 1948 through 1951 there was no person, firm or corporation manufacturing, in the State of Iowa, equipment for electric generating plants which was comparable in size and performance to the equipment identified in Exhibits 1 through 11. During those same years there was no person, firm or corporation that stocked equipment of comparable size and performance with the equipment represented in Exhibits 1 through 11." Mr. John H. Ames, city manager of appellee, and

Mr. E. F. Behrens testified to the same effect. It is true the burden of proof is upon the taxpayer who seeks relief from an assessment. Dain Mfg. Co. v. Iowa State Tax Comm., supra, at page 533 of 237 Iowa, page 788 of 22 N.W.2d. But since there is no substantial dispute in the facts here, the appellant having offered no evidence of its own except such as was contained in stipulations of fact, we think the appellee has carried the burden imposed.

Since it is the use of the property in Iowa that is taxed, we find no escape from the conclusion it is the law at the time the material comes to rest here that must govern its taxability. The commission was far outside its permissible scope of administrative rule and regulation in attempting to change the governing rules of law by saying the law as it stood at a time other than the time of taxability should be applied. It had no right to tax the property until it came to rest in the state; and surely the taxpayer is within his rights in insisting his liability must be determined by the law in effect at the time of potential assessment. When the property, with the exception of that described in Exhibit 1, was delivered to the appellee in Iowa, chapter 193 of the Acts of the Fifty-third General Assembly was in effect, and it necessarily governed, rule 172A of the commission to the contrary notwithstanding. The commission's own rule 170 says: "The use tax law imposes a tax on the purchaser for the privilege of *using* tangible personal property in the State of Iowa * * *." (Italics supplied.) Again, its rule 173 refers to the tax being assessed against persons who "use" tangible personal property in the state. But that part of rule 172A which attempts to make the law at the time of contract govern rather than at the time of delivery is clearly in derogation of chapter 193, supra, and in contradiction of the commission's own rules previously made and still in force. Since this part of rule 172A could be material in any event only when there was a change in the law between the time of contract and the time of delivery, the impression comes to mind that it was made for a special purpose and to avoid the application of chapter 193 to the appellee here and such other citizens as might find themselves in the same situation with reference to the respective dates of purchase and delivery and of the

taking effect of the legislative enactment. The commission should be impartial as between the taxpayer and the state. It is its duty to collect all taxes properly due the state; but it may not, and should not, attempt to change the law to impose taxes beyond the fair intent of the legislative enactments. Under the facts shown and the applicable law, the trial court correctly held that the property described in Exhibits Nos. 2 to 11 inclusive was not readily obtainable in Iowa.

III. A considerable portion of the briefs is devoted to the question of strict or liberal construction of the governing statutes. We shall not discuss this question. As we held in Dain Mfg. Co. v. Iowa State Tax Comm., supra, at page 534 of 237 Iowa, page 788 of 22 N.W.2d, the result here does not depend upon a strict or liberal rule of construction. In either case the conclusions would be the same. We have pointed out above that there was no real dispute of fact involved, and the appellee has carried the burden imposed.

Nor shall we concern ourselves with the question whether chapter 193, supra, was retroactive in effect. By its terms it became effective on April 1, 1949, and we have pointed out in Division II that its provisions ruled the right of the state to tax goods delivered and used in the state thereafter. It was not necessary that it be retroactive to rule the situation as to the property described in Exhibits Nos. 2 to 11 inclusive, which are the subject matter of the commission's appeal.

IV. We turn next to the question whether the materials and equipment referred to in these exhibits were "directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail." This necessitates a consideration of extremely technical questions concerning the point at which the manufacturing of electricity ceases and its distribution begins. While we have held in Division II that the property described in Exhibits 2 to 11 inclusive was not readily obtainable in Iowa, that conclusion solves only one half of the problem. To be free from use tax it must have been "industrial materials and equipment * * * directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail." Code section 423.1(1). There is no

real contention that these items were not "industrial materials and equipment" or that the tangible personal property produced, i. e., electricity, was almost all intended to be sold at retail, and we held definitely in State ex rel. Winterfield v. Hardin County Rural Electric Cooperative, 226 Iowa 896, 285 N.W. 219, that generating electricity is manufacturing. The question is whether the various items were to be used in manufacturing or servicing the electricity generated, or were merely a part of the distribution system which carries the current after it is produced, or otherwise are not "directly" used in manufacturing or servicing. We shall take up the items in detail.

Exhibit 2.

This item is a turbo-electric generator; and since the appellant concedes that it is the equipment (and the only part of the equipment, it contends) which manufactures the electricity, no further attention need be paid to it. Clearly it is within the exclusion of the statute and not subject to use tax.

Exhibits Nos. 3, 4, 5, 10 and 11.

The equipment involved in each of these items is subjected to the same challenge by the appellant, and they will be considered together. Exhibit 3 is a surface condenser, which condenses steam into water so that it may be used again. Exhibit 4 is a steam generator, or boiler. Exhibit 5 is coal handling equipment. Exhibit 10 is boiler feed pumps, and Exhibit 11 is ash handling equipment. All of these items are connected together in the plant and are equipment used in processes necessary for creating power to operate the turbogenerator, which in turn produces the manufactured product which is the purpose of the plant, the electricity. The surface condenser is used to take away the steam after it has passed from the steam generator through the turbine which is connected directly to the turbogenerator and which generates the electric current. The steam, after being condensed into water, eventually passes back to the steam generator. John H. Ames, city manager of the appellee-city, a graduate civil engineer, testified: "The vacuum created by the condensation of the steam in the condenser is a power factor in the turning of the turbine. It is necessary to extract or to utilize as much vacuum as possible in connection with the turbine operation—the higher the vacuum the more efficient the

turbine operates. The surface condenser is an essential part in the manufacture of electricity in the Ames plant."

Exhibit 4 is the steam generator which produces the steam which passes through the turbine and so operates the turbogenerator which produces the final marketable product, the electricity. Exhibit 5 is the coal handling equipment which feeds the coal to the steam generator. Exhibit 10, the boiler feed pumps, are used, in the language of Mr. Ames, to "ultimately put the water into the furnace, into the steam generator under pressure, six hundred pounds per square inch pressure. On Exhibit 50 all of the water lines are marked in blue. The blue lines shown on the interior of the steam generator are fed by the boiler feed pumps. The boiler feed pumps are essential to the manufacture of electricity in the Ames plant."

Exhibit 11 is the ash handling equipment. It consists of three collection hoppers, one located immediately below the dust-collecting device, one below the furnace to pick up fine ash that sifts through the grate, and the third in front of the grate to collect the major part of the ash. The ashes are then removed from the plant by high-pressure steam. Mr. Ames testified: "This ash handling equipment is an essential part of the manufacturing process of electricity in our plant."

The major contention of appellant in regard to Exhibits Nos. 3, 4, 5, 10 and 11 is that they are not directly used in the manufacturing or servicing of electricity within the meaning of Code section 423.1(1)(c). The commission would limit the equipment not taxable under this section to that which actually produces the voltage; that is, the turbogenerator. We think such a construction too narrow under any possible interpretation of the statute. To say that a steam generator which produces the power that operates the turbines is not a direct part of the process of manufacturing electric current would be a surprising and unnatural construction and one we cannot believe the legislature intended. The process of manufacturing electricity is a complicated one and requires several steps. When it is produced in what is known as a steam plant, which is the common one where water power is not used, surely some means of initial power, such as coal, is necessary. This implies a coal-burning and steam-

generating operation; and it seems an unreasonable refinement to say these are not part of the manufacturing of electricity.

It is true the coal handling equipment, the steam generator, the surface condenser, the boiler feed pumps, and the ash handling machinery are not the final instrumentalities through which the electric current emerges. But the turbogenerator, which the commission concedes is the direct manufacturing machine, would be useless without at least the steam generator. This, in turn, is materially aided in its operation by the boiler feed pumps and the coal handling equipment. Perhaps the surface condenser and the ash handling machinery are not entirely vital to the process. But they are machinery which materially aids the operation of the plant, if we are to accept the undisputed factual record in the case. The surface condenser, according to the testimony of the expert witnesses for the city, which stands undenied, is a power factor in the operation of the turbine, and is essential to the manufacture of electricity in the plant. As to the ash handling equipment, it needs no technical understanding to know that when coal is burned as a source of power or heat, some means must be arranged for the disposal of the ashes. Efficient operation of the plant requires these things, and we conclude they are an essential part of the manufacture of electricity.

In State ex rel. Winterfield v. Hardin County Rural Electric Cooperative, 226 Iowa 896, 907, 285 N.W. 219, 224, supra, the question at issue was whether a cooperative association formed to engage in manufacturing and distributing electrical energy was engaged in one business or two. The relator contended it was two; but this court said: "To us the position taken by the relator is strained and supertechnical construction run riot."

We also approved this language from Lynch v. Alworth-Stephens Co., 8 Cir., Minn., 294 F. 190, 194: "And the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover."

Under any fair construction of the statute, giving the word "direct" a reasonable meaning, we think all of the items described in Exhibits Nos. 3, 4, 5, 10 and 11 are properly classified as being directly used in the actual manufacturing of electricity.

Exhibit 7.

The equipment covered by this exhibit is described as "13.8 KV switchgear." Several expert witnesses described this machinery and its uses. It may be roughly characterized as having two functions: one, it draws the current from the generator, and two, it protects it from overloads. Dr. Warren B. Boast, professor of electrical engineering at Iowa State College, testified at some length on this point. It is not possible to give all of his testimony in full, but these excerpts are significant:

"At the point in the switchgear where the electrical current carries the energy into this switchgear bus system, control and measuring equipment is attached to the circuit to determine the functioning of the generator, and then the energy is diverted through various paths from this switchgear. * * * The control of the generator itself in this installation is functionally accomplished in this switchgear. * * *

"If the operation between the generator and switchgear was cut in the presence of a load, several things could happen, but if we assume it was done in the simplest case just before a load was added, there would be no possibility of transferring the electrical energy then from the generator to any part of the system. The voltage would be present; the conductors would have induced in them the electrical voltage, but there would be no closed circuit and there would be no current, and since three elements of voltage, current and time are involved, and one of these could not be other than zero, there could be no electrical energy converted. Without the connection to the switchgear there would be no current. * * *

"If three blocks away from the plant one of the positive wires on the transmission line would break and hit the ground, there would be an overcurrent condition when it touched the ground, and that overcurrent would be sensed by the protective equipment in the cubicle and that, in turn, would open the circuit breaker, and preserve the remaining part of the system—that is one of the very important functions of the switchgear."

Mr. E. F. Behrens, an engineer employed by a construction firm which specializes in power generation and power-plant design, said: "It [the switchgear] has the further use that it is a protective device to protect the generator from becoming dam-

aged due to excess current due to a fault. Since continuity of service is the essence of making the electricity, this is a very necessary function of these breakers in the switchgear."

Doctor Boast also said that until the switchgear closes the circuit there is only voltage manufactured rather than electricity. If its sole function were only to protect the generator from excess loads brought on by faults or other unforeseen happenings, it would still render an important service. But it also closes the circuits to create electrical energy as opposed to mere voltage. "Servicing" means to render a service; and the service rendered by the 13.8 KV switchgear here seems apparent. Without it, Doctor Boast said, there would be no electrical energy transferred from the generator to any part of the system. If any substantial part of the function of the switchgear is either manufacturing or servicing electricity, the use tax does not apply.

We find in 30 A. L. R.2d 1439, in the annotation on page 1446, this language: "It appears that machines or materials may be 'used' in manufacturing or processing so as to be free from use tax although they are not exclusively so used."

In Michigan Allied Dairy Assn. v. Auditor General, 302 Mich. 643, 5 N.W.2d 516, the Michigan Supreme Court held that cans and bottles used in dairying were properly excluded from the tax, although a considerable part of their function was merely to serve as containers for distribution to customers. But since they were also used in cooling the milk, they were held to be a part of the "industrial processing" of the milk.

In Dain Mfg. Co. v. Iowa State Tax Comm., supra, at page 538 of 237 Iowa, page 790 of 22 N.W.2d, it is held: "An article may be *directly*, without being *entirely*, used for a given purpose." (Italics are quoted.)

Exhibits 6, 8 and 9.

Exhibit No. 6 concerned two substations located in the State College area in the west part of the city. Doctor Boast says of these: "A substation consists of control equipment, mainly switches, and a transformer for converting the energy to a lower voltage level."

Exhibit 8 is a contract for a 5000 KVA transformer, the function of which is also to change the voltage to a lower level;

and Exhibit 9 deals with load center substations. These are located within the plant, but their essential function is the same as for those described in Exhibit 6. They likewise consist of control equipment and transformers. The record indicates the chief purpose of the load center substations was to transform energy received from the old plant which had theretofore been used in Ames and which was to be kept in operation.

It is evident all the items described in Exhibits Nos. 6, 8 and 9 deal only with controlling and transforming the voltage of the electricity after it is manufactured. Under the holding of the prevailing opinion in Peoples Gas & Electric Co. v. State Tax Comm., supra, this equipment is neither used in manufacturing nor servicing electricity, and so is subject to use tax. The learned trial court was in error in holding otherwise as to these items.

V. The controversy here is between and concerns only the City of Ames and the Iowa State Tax Commission. It appears at least a substantial part of the tax claimed to be due on the steam generator and auxiliaries described in Exhibit 4 has been paid by the suppliers, who are not parties to this action. We content ourselves with our holding that no use tax was or is due to the State of Iowa on this equipment.

VI. The commission urges that as to some of the items at least the offer to sell, the acceptance, and delivery were all made at Ames, although shipment was made from outside the state; and that title did not pass from the seller to the purchaser until delivery at Ames; and this, the commission thinks, makes the property liable to a sales tax if not to a use tax. One answer seems to be that the tax which the commission has attempted to levy and which we are considering is a use tax. Sales and use taxes are clearly distinguishable. 47 Am. Jur., Sales and Use Taxes, section 42. In the annotation in 129 A. L. R. 236, it is said: "A sales tax and a use tax are by no means identical." The distinction was pointed out in Mann v. McCarroll, 198 Ark. 628, 637, 130 S.W.2d 721. We have already quoted in another connection the language of the United States Supreme Court in Nelson v. Sears, Roebuck & Co., supra, 312 U. S. 359, 363, 61 S. Ct. 586, 588, 85 L. Ed. 888, to the effect that it is use in Iowa that is taxed, *"regardless of the time and place of passing title * * *."*

(Italics supplied.) The commission's position at this point is without merit.

 VII. It remains to consider the appeal of the City of Ames. This concerns two items. The first is described in Exhibit 1, as a 4.16 KV switchgear. The situation, as previously noted, differs from that pertaining to the other items of equipment in that this particular one was delivered on March 7, 1949, and so before chapter 193 of the Acts of the Fifty-third General Assembly took effect. The record shows there were agencies in Iowa which could have ordered this item, and which were dealing in comparable equipment, although there was no actual manufacture of it nor was it kept for sale in the state. The city thinks the fact this was custom-built for the Ames plant takes it out of liability for the tax. By this we presume is meant that there was no dealer or agent in the state who was in the business of selling and ordering the exact style of switchgear needed for this particular plant. But the record shows there were dealers who were in the business of selling comparable items, ordered from outside the state, and who could have ordered, in fact did order, this particular equipment. While in one sense the equipment was ordered for the particular plant, we think since it could readily have been ordered by an agent or dealer in Iowa, under the interpretation of the law prevailing prior to April 1, 1949, it was readily obtainable here.

 The second item involved in the city's appeal is a freight charge paid upon the shipment of cast-iron pipe purchased from a firm in Birmingham, Alabama. Mr. John H. Ames, city manager, testified that the bid accepted by the city named a price for the pipe f.o.b. Ames. But the city paid the freight charge and deducted this amount from the price remitted to the seller. This amounts to no more than payment of the agreed price in two installments. If the purchase price had been for a fixed amount f.o.b. Birmingham, the buyer would have been required to pay the freight, and this charge would not have been a part of the amount paid for the goods. The situation would then have been comparable to that existing in Dain Mfg. Co. v. Iowa State Tax Comm., supra. By section 423.2, the use tax is imposed upon "the purchase price of such property." We said in the Dain case, page 540 of 237 Iowa, page 792 of 22

N.W.2d: "The purchase price depends on the contract between the parties. The contract might be such that transportation and delivery charges would be included * * *." Here these charges were in fact included in the price. Dividing the price in two parts, the freight charges in one installment and the remainder of the price in another, does not change the situation. The total agreed purchase price was a definite amount f.o.b. Ames, and the commission was entitled to compute the tax upon that amount, without regard to the manner in which it was actually paid.

We conclude the judgment of the trial court must be affirmed as to all items involved in the commission's appeal except for those designated as Exhibits Nos. 6, 8 and 9, as to which it is reversed; and affirmed upon the city's appeal.— Affirmed in part and reversed in part as to the appellant's appeal; affirmed upon the cross-appeal of the appellee. Costs taxed two thirds against the appellant-commission, and one third against the appellee-city.

WENNERSTRUM, C. J., and BLISS, GARFIELD, LARSON, and SMITH, JJ., concur.

OLIVER, J., dissents from Division II.

MULRONEY and HAYS, JJ., dissent.

MULRONEY, J. (dissenting)—I respectfully dissent. My nonagreement with the majority opinion is chiefly with Division II where the majority holds the time to determine whether the property is readily obtainable in Iowa is not the date of the purchase from the out-of-state vendor but the date of delivery into Iowa after the purchase. The commission rule, 172A, which the majority strikes down, provides:

"When determining whether an item of tangible personal property is or is not 'readily obtainable in Iowa' the facts and the law existing at the time the contract to purchase was made shall govern and not the facts and the law existing at the time the item was delivered into the state of Iowa."

As I read the majority opinion it seems two reasons are given why the above rule is wrong: (1) since delivery in Iowa

governs taxability·under the use tax law, it must follow the facts and the law at the time of delivery must be when "readily obtainable" must be determined, and (2) the rule, which was adopted after the effective date of chapter 193, 53d G.A., is an attempt to change the law, and is in derogation of that law. By a not too subtle statement the commission is accused of adopting the rule "for a special purpose and to avoid the application of chapter 193."

I. The original use tax law enacted in 1937 contained this exemption from tax for the use of certain industrial material purchased from an out-of-state vendor. The first condition precedent to the application of the exemption was that it be "not readily obtainable in Iowa." All through the years the commission and the taxpayers have considered the date of the purchase as the date when the question of obtainability was to be determined. A reading of the opinion in Dain Mfg. Co. v. Iowa State Tax Comm., 237 Iowa 531, 22 N.W.2d 786, shows clearly that both parties and the trial court and this court considered the time of placing the order was the time to be used in determining whether or not property was obtainable. So too in Peoples Gas & Electric Co. v. State Tax Comm., 238 Iowa 1369, 1378, 28 N.W.2d 799, 805, the opinion shows the exemption as to the use of certain items was "based upon the circumstances surrounding their purchase."

This section of the use tax law giving a tax exemption for the use of certain industrial material purchased out of the state when the same material was "not readily obtainable in Iowa" has proved a fertile source of difficulty for the commission—not because of the time when obtainability should be determined but because "readily" is a word of comparison and a definition of "obtainable" can range from "conveniently at hand" to "possible to secure." The commission was charged with the duty of making general regulations to carry out the legislative purpose. Its first regulation interpreted " 'readily obtainable in Iowa' " to mean " 'kept in Iowa for sale or manufactured in Iowa for sale as distinguished from being obtainable by giving an order to an agent in Iowa for delivery of the same from some point outside the State of Iowa.' " See Dain Mfg. Co. v. Iowa State Tax Comm., 237 Iowa 531, at page 536, 22 N.W.2d 786. Here it

is apparent the commission was interpreting the law as requiring the time for determining obtainability as the time of the order. There were changes in the rule, in effect making property purchased from distributors, and agents of out-of-state sellers, *obtainable*, but there have been no changes in the commission's rule that the time to determine obtainability is the time of the purchase.

The question of readily obtainable, was, up until the enactment of chapter 193, supra, merely a fact question. There was no change in the law. It depended on a factual situation—the condition of the market place. Clearly it meant the situation at the time the purchase was made and the order placed with the out-of-state seller. If the same or similar property could then be purchased in Iowa, no exemption could be obtained on the ground it was not readily obtainable in Iowa. The commission narrowed the exemption by later rules to protect local distributors competing with out-of-state vendors, but always it was a question of whether the Iowa vendee could, at the time he bought, obtain the same or similar goods from Iowa retailers, manufacturers or distributors. This was a reasonable application of the statute and it was never questioned. As was said in Peoples Gas & Electric Company case, supra, the principal purpose of the enactment of the use tax law was to protect the Iowa retailers whose sales were subject to sales tax. The appropriate time to determine when property is obtainable is when the out-of-state order is placed. This law does not forbid buying from out-of-state vendors. It merely states the purchaser will gain no two per cent advantage over an Iowa retailer or manufacturer by buying from an out-of-state vendor, when the property he buys could be purchased here. The proper time to consult is the merchandising situation with respect to Iowa dealers and manufacturers at the time the order is placed with the out-of-state vendor.

The first basis for the majority conclusion seems to me unsound. The majority repeats many times that no tax results until the property is delivered into Iowa, and much authority is cited for this conclusion. To me this is belaboring the obvious. No one contends there would ever be any use tax due until the property reaches Iowa—whether it be industrial material

or not, and whether the same or similar property would or would not be readily obtainable here. This is specified in the statute which only taxes use in Iowa. This is an exemption statute which has no application at all until an Iowa purchaser has made an out-of-state purchase of a piece of industrial material and is actually using it in Iowa. It is idle to talk of purchase contracts, broken or canceled, and the "slips [that] may occur between the cup and lip." The purchaser is seeking to have his actual use of property he purchased from an out-of-state vendor declared exempt. He should prevail if the first statutory condition precedent to the exemption is established: that it was not readily obtainable in Iowa. It is perfectly obvious that this should be established as of the date he sought to obtain the property—the date of the order. If at that time, when he ordered from the out-of-state vendor, the property could be bought here, it was obtainable in Iowa.

II. The second basis for the majority conclusion that rule 172A is unsound is that it is in derogation of chapter 193, 53d G. A. The new law, chapter 193, explains by contrast the new rule of obtainability that was to be followed by stating: "as distinguished from being obtainable by giving an order to an agent in Iowa for delivery from some point outside the state of Iowa."

Certainly this is a clear statement that the legislature regarded the "readily obtainable" law prior to chapter 193 to be and include giving an order to an agent in Iowa, and it is inescapable that it regarded the time of determining the "obtainable" question as being when the order was given and not at some later date when the property was delivered. There is nothing in chapter 193 which remotely indicates that the legislature intended the time of delivery in Iowa should be chosen as the time to investigate the activities of Iowa manufacturers or suppliers to see if they could then supply the same or similar material.

I think the imputation of bad faith to the commission entirely unwarranted. As Judge Smith pointed out in the Dain case, the commission has a difficult task to apply the provisions of this exemption "to the varied transactions of present-day busi-

ness." Chapter 193, supra, was the first inkling the legislature ever gave the commission as to how it wished "readily obtainable" defined. It is clearly apparent the legislature knew the commission was determining readily obtainable as of the time of purchase and not delivery. The pertinent portion of chapter 193 is actually a copy of the commission's first regulation (see Dain case) and the legislature did not in chapter 193 give the commission the slightest indication that it wished the "readily obtainable" issue decided as of the date of delivery. The majority says chapter 193 was an order to the commission to determine obtainability as of the date of the delivery, and the commission's rule saying it would be determined as of date of purchase was in derogation of the law in chapter 193, supra. Indeed the majority holds the order to the commission to use the date of delivery to determine obtainability is so plain in the statute, the commission was probably in bad faith in continuing to determine obtainability as of the date of the purchase. This in spite of the fact that chapter 193, in discussing obtainability, speaks of "giving an order to an agent." I see no basis at all for the majority's conclusion or words of criticism of the commission.

There is no need to review the evidence. There was ample evidence to show that when most of the purchases were made prior to April 1, 1949, the material purchased could have been purchased from Iowa agents and jobbers regularly engaged in selling the same or comparable equipment. The legislature evidently thought these agents and jobbers no longer need protection, but their protection stopped beginning April 1, 1949.

One further comment should be made. The majority has today, entirely without basis I think, drawn a new regulation for the commission. It is: readily obtainable will be determined from now on as of the date the property purchased out of state is delivered into Iowa. As pointed out, obtainability is a factual situation. It depends on the condition of the market place which is subject to change. This will mean a purchaser might buy a carload of material that he could have bought in Iowa from a supplier, and his use will be exempt if before delivery the Iowa supplier goes out of business. So too it will mean a purchaser who is unable to buy his material from any Iowa supplier and buys outside the state will have to pay the tax on the ground his mate-

rial was obtainable, if some supplier stocks the material before delivery into Iowa. I submit the rule the majority draws is far more unreal than the commission's rule 172A.

While I would not disagree with all of the conclusions expressed in the other divisions of the majority opinion, I would not reach most of those questions because of the views expressed herein. I have said enough to show that in general I would reverse.

HAYS, J., joins in this dissent.