ALLIS-CHALMERS MANUFACTURING COMPANY, appellee, v. IOWA STATE TAX COMMISSION et al., appellants.

No. 49481.

(Reported in 92 N.W.2d 129)

SEPTEMBER 16, 1958.
REHEARING DENIED NOVEMBER 21, 1958.

Norman A. Erbe, Attorney General, Francis J. Pruss, Special Assistant Attorney General, and J. M. Barrett, Special Counsel, of Des Moines, for appellants.

Gibson, Stewart & Garrett, of Des Moines, for appellee.

Peterson, J.—Farley & Loetscher Manufacturing Company is a large industrial plant in Dubuque, occupying 21 acres and employing approximately 1000 employees. They are engaged in the manufacture of millwork and plastics.

In 1946 they decided to install a modern turbogenerator unit and all auxiliary equipment, for the purpose of generating the electricity needed for the plant, operating a large number of woodworking machines, and to provide steam at high pressure for preparation of plastic material.

There was no plant of the capacity and size needed by them on the market in Iowa, nor anywhere in the country. They retained a firm of power-plant engineers in Chicago to design the plant and to procure bids from suppliers over the nation who were equipped to manufacture such a turbine and generator and all auxiliary appliances. They secured bids from five large firms, all located outside of Iowa.

Contract was entered into with plaintiff for manufacture and installation of the industrial equipment. The final cost was $85,914.58.

By reason of the provisions of sections 423.1 and 423.2, 1950 Iowa Code, neither plaintiff nor Farley & Loetscher paid use tax on the cost of the installation.

In 1950 a representative of the Iowa State Tax Commission made a check of the records of plaintiff at its home office at West Allis, Wisconsin, discovered the sale, and that no use tax had been paid. The State Tax Commission levied a use tax against

plaintiff of $1718.29, together with interest of $430.18, which was paid.

Plaintiff filed claim for refund, which was rejected. According to statutory provision, plaintiff appealed to Polk County District Court. Judgment and decree was entered ordering the State Tax Commission to refund the tax. The Commission has appealed.

Chapter 423, 1950 Code, pertains to "use tax." Section 423.2 provides: "Imposition of tax. An excise tax is hereby imposed on the use in this state of tangible personal property purchased * * * for use in this state, at the rate of two percent of the purchase price of such property. Said tax is hereby imposed upon every person using such property within this state until such tax has been paid directly to the county treasurer, to a retailer, or to the commission as hereinafter provided."

Section 423.1 defines words, terms and phrases of the "Use Tax Act." Section 423.1(1) provides: " 'Use' means and includes the exercise by any person of any right or power over tangible personal property * * * except that it shall not include * * * (c) industrial materials and equipment, which are not readily obtainable in Iowa, and which are directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail."

Chapter 193, section 2, Acts of the Fifty-third General Assembly, amended the definition as to "readily obtainable", which amendment became effective on April 1, 1949. The amendment is now 423.1(10), 1958 Iowa Code: " 'Readily obtainable in Iowa' shall mean kept in Iowa for sale or manufactured in Iowa for sale as distinguished from being obtainable by giving an order to an agent in Iowa for delivery from some point outside the state of Iowa."

■ This case has been tried on the theory of liability of Farley & Loetscher Manufacturing Company as to the use tax under consideration, although plaintiff paid the tax and is asking for refund. If there was use-tax liability it would be the ultimate obligation of Farley & Loetscher. This is the entity in Iowa "using" the personal property involved. Since there is no liability we only mention the situation for clarification.

Appellants assign eleven propositions relied on for reversal. They can all be combined and considered under four propositions. 1. The Farley & Loetscher installation was subject to use tax because there were three national firms maintaining order houses in Iowa where the industrial material involved in the case could be readily obtainable. 2. Murray Iron Works of Burlington was equipped to erect the industrial installation built by plaintiff, and the improvement was therefore readily obtainable in Iowa. 3. The turbogenerator installation by Farley & Loetscher was not directly used in fabricating, compounding, manufacturing or servicing tangible personal property intended to be sold ultimately at retail. 4. The procedure adopted by appellee for refund of the tax paid was not correct.

I. Various principles involved in the interpretation of the statutory provisions heretofore cited have received the consideration of this court in recent years. The fact situation in the case at bar is somewhat different from cases heretofore considered. However, we have announced principles which are either directly or indirectly helpful in arriving at our conclusion in this case. The principal recent cases pertaining to various phases of use-tax exemption, or where use tax was held not payable, are: Zoller Brewing Co. v. State Tax Commission, 232 Iowa 1104, 5 N.W.2d 643, 6 N.W.2d 843; Dain Mfg. Co. v. Iowa State Tax Commission, 237 Iowa 531, 22 N.W.2d 786; Peoples Gas & Electric Co. v. State Tax Commission, 238 Iowa 1369, 28 N.W.2d 799; Morrison-Knudsen Co., Inc., v. State Tax Commission, 242 Iowa 33, 44 N.W.2d 449, 41 A. L. R.2d 523; City of Ames v. State Tax Commission, 246 Iowa 1016, 71 N.W.2d 15; Bruce Motor Freight, Inc., v. Lauterbach, 247 Iowa 956, 77 N.W.2d 613.

One fact situation in this case different from our previous cases is that Farley & Loetscher Manufacturing Company decided they needed a complete new electric and steam pressure plant, to be erected on the factory premises. They were not buying certain specific articles of industrial installation. No plant of the size and nature involved was stockpiled in Iowa nor in the nation. The general name of the installation is turbogenerator plant, which name we will use. Technically, it consisted of one "2000 kw automatic bleeder turbine-generator unit and one 1500

sq. ft. surface condenser", with many auxiliary items. The installation has a dual purpose. One is to furnish electrical energy for the complete plant and for the many dozens of machines operated by electric motors for manufacturing woodwork of all types. The other is to furnish steam under high pressure for preparation of plastic material.

Farley & Loetscher retained the engineering firm of Laramore & Douglass, Inc., of Chicago, to prepare plans and specifications for this extensive installation and to submit same, together with contract forms, to manufacturing companies over the nation who had sufficient experience and capacity to manufacture a dual purpose plant of the type required. Bids were submitted by the five following companies: Worthington Pump & Manufacturing Company; General Electric Company; Westinghouse Electric & Manufacturing Company; The Elliott Company; Allis-Chalmers Manufacturing Company.

Two factors were taken into consideration by Farley & Loetscher in connection with the bids. One was the price, and the other was the minimum of time within which the installation could be completed. A large amount of the material necessary for the erection of the plant was in critical shortage in the years immediately after World War II and the spread in the bids as to time for erection and completion varied from 300 to 450 working days. Partly because of the amount of its bid, and also because of its agreement as to shorter number of days of installation, the bid of Allis-Chalmers Manufacturing Company was accepted.

The new industrial plant was in the process of installation from 1947 until 1949. It was completed and turned over to Farley & Loetscher in July 1949. Chapter 193, Acts of Fifty-third General Assembly (heretofore quoted), became effective on April 1, 1949. This date was of importance in City of Ames v. State Tax Commission, supra. It is of importance in this case.

The contracts for the purchase of eleven items of improvements for the Ames electric plant were made prior to April 1. The Tax Commission contended the date of the contract was the date on which the use tax became due. City of Ames claimed the date on which the various items were delivered was the effective date as to the use-tax obligation. One item was delivered prior

to April 1 and all other items were delivered thereafter. We held the date of delivery was the effective date because on that date the personal property came at rest upon the property of the city. We held seven items delivered after April 1 were not subject to use tax by reason of provisions of chapter 193.

In the case at bar hundreds of items were delivered on the manufacturing plant property of Farley & Loetscher from time to time from 1947 to 1949. There is a distinction between these items and the items delivered to the City of Ames. The items delivered to Ames immediately became the property of the city and promptly became a part of the electric light plant. The items delivered by and to Allis-Chalmers Manufacturing Company on the Farley & Loetscher factory ground were not in fact delivered to Farley & Loetscher until the plant was completed by plaintiff and ready for delivery in July 1949. Mr. R. F. Loetscher testified: "* * * this power plant did not operate, was not accepted by us as purchaser of equipment until July 1949." As far as Farley & Loetscher were concerned the industrial material and equipment did not come at rest until that date. They exercised no "right or power" over the property until then. Under these circumstances chapter 193, Acts of Fifty-third General Assembly, was in force and effect, although General Electric, Westinghouse and Allis-Chalmers all had order houses in Iowa. By specific legislative provision as to order houses the industrial installation was not subject to use tax. This was the finding and decision of the trial court, and we approve.

II. Murray Iron Works has been in business at Burlington since 1870. They manufacture boilers and turbines. Up until the time Farley & Loetscher had plans prepared for their large new industrial installation, Murray Iron Works had never manufactured a turbine of the size required for this improvement. They never have manufactured generators.

Mr. John Siekert, secretary of Murray Iron Works, the only witness for defendant, was asked:

"Q. Did the Murray Iron Works build the generators which were sold with the turbogenerators with turbines? A. We do not build generators. * * *

"Q. In fulfilling such contracts, where did the Murray Iron Works obtain the generator that was used? A. We formerly had

a supplier of generating equipment known as the Crocker-Wheeler Electrical Manufacturing Company located in Ampere, New Jersey, who are an independent company like ourselves. They had no connection with any turbine manufacturer, but they did build turbo-type generators, and we directly bought generators from that company for use with our turbines * * *

"Q. Now, can you tell us whether or not prior to 1946 Murray Iron Works had produced, manufactured, and installed a turbine with a generator with automatic extraction and with the same condenser as this equipment in the case at bar? * * * A. Are you including the automatic extraction feature in this particular question?

"Q. Yes. A. We did not. * * * we did not specifically have sales literature in 1945 or 1946 describing turbines on that type of unit."

The specifications prepared by the engineers provided that the turbine and generator should be manufactured by the same company. The provision was: "The turbine and generator shall be of the same manufacture so as to obtain *undivided responsibility* of the complete unit before, during and after installation; and also to insure a complete, compact and pleasing design. *Bids will not be considered* if these two parts of the unit are not of the same manufacture." (Emphasis ours.)

This situation does not measure up to the intention of the legislature as to "industrial materials and equipment" being "readily obtainable in Iowa" for two reasons. First: Since Murray Iron Works had never manufactured a turbine of the size and capacity needed for this installation, Farley & Loetscher were not obligated to experiment on whether or not they could fulfill their requirements. Second: Since their engineers considered the matter of sufficient importance as to installation of a successful plant, to require that the turbine and generator be manufactured by the same company, Farley & Loetscher were not obligated to buy from an Iowa company that did not manufacture generators.

Mr. R. F. Castner, representative of Westinghouse in Iowa, testified:

"Q. Is there any equipment like this equipment that is involved in this case kept in stock or storage anywhere in Iowa for

sale to customers? * * * A. I would say no, sir. Those are usually special made. I doubt if there is another turbine in the country exactly like that one."

III. Appellants contend this industrial installation was not directly used in the manufacture of tangible personal property intended to be sold ultimately at retail.

As to this question, the facts in the case at bar are shown in the testimony of Robert F. Loetscher, vice-president and manager of Farley & Loetscher. This evidence is uncontradicted. He testified:

"The electric motors are directly connected to the cutter heads or the saws which cut the wood. * * * since our equipment has been electrically motor driven, we depend entirely upon the electricity to drive these motors to drive the knives and saws which cut the wood. All of the electricity for this entire factory is furnished by this turbine-generator unit. It operates 24 hours a day, 7 days per week, sometimes for as long as twelve months at a time without stopping, or as we might say, 'without missing a lick'. We depend upon this completely for the operation of our factory and for the producing of our millwork. * * *

"This turbine generator not only makes the electricity, but it furnishes steam which passes through it for our processing. This steam we use to heat the platens of hydraulic presses. For example, these presses are used in gluing wood together, as we used to say. Now we say we resin bond it together, using a thermal-setting resin which is an adhesive which makes two pieces of wood when coated with resin heat to a sufficient temperature and bonds together so they become one unit. * * *

"Now, in our plastic works, we also have presses which are heated. We have motors. We drive resin out of paper which makes plastics. We glue the plastic surfaces to wood. All this requires the electricity and the steam."

There must always be a first step in the manufacture of doors, blinds, frames, moldings, cabinets, interior finish for homes, plastic dinettes and table tops, and many kindred items. Farley & Loetscher take that first step as they convert rough lumber to proper dimensions and shapes for lumberyards, contractors and carpenters, and prepare plastic material for plastic appliance manufacturers.

The lumberyard sells to customers; contractors and carpenters use the material in home and building erection; and furniture and appliance stores sell plastic items of all descriptions. In each case the customer pays the sales tax on these articles "sold ultimately at retail." We approve the trial court's finding of fact "* * * that the end products manufactured and fabricated by it [Farley & Loetscher] are ultimately sold at retail."

We have considered this question in three previous cases: Zoller Brewing Co. v. State Tax Commission, Dain Mfg. Co. v. Iowa State Tax Commission, and City of Ames v. State Tax Commission, all supra.

In Zoller Brewing Co. v. State Tax Commission, supra, we held a mechanical bottle case packer was not subject to use tax because it is industrial equipment and directly used in manufacture of tangible personal property intended to be sold ultimately at retail.

In the Dain case we said at page 538 of 237 Iowa, page 790 of 22 N.W.2d: "The article is conceded to have been 'generally' used in producing or preparing property intended for retail sale. That seems sufficient under the statute. An article may be *directly*, without being *entirely*, used for a given purpose." The facts in the case at bar are even stronger than this quotation. The turbogenerator installation was used *entirely* to start the manufacture of items ultimately entering into retail trade.

There is a striking similarity between this case and the City of Ames case concerning direct use of the industrial instrumentality as to the end product.

The Ames case involved the question of liability for use tax as to various items of equipment purchased by the city for its municipal electric power plant. The Tax Commission claimed they were not directly used in fabricating the end product. Some of the articles held not subject to use tax as against contention of the Commission were: surface condenser; steam boiler; coal handling equipment; boiler feed pumps; and ash disposal equipment. As to these industrial items we said (pages 1027, 1028, 1029 of 246 Iowa):

"All of these items are connected together in the plant and are equipment used in processes necessary for creating power to

operate the turbogenerator, which in turn produces the manufactured product which is the purpose of the plant, the electricity. The surface condenser is used to take away the steam after it has passed from the steam generator through the turbine which is connected directly to the turbogenerator and which generates the electric current. The steam, after being condensed into water, eventually passes back to the steam generator. * * *

"The commission would limit the equipment not taxable under this section to that which actually produces the voltage; that is, the turbogenerator. We think such a construction too narrow under any possible interpretation of the statute. * * *

"It is true the coal handling equipment, the steam generator, the surface condenser, the boiler feed pumps, and the ash handling machinery are not the final instrumentalities through which the electric current emerges. But the turbogenerator, which the commission concedes is the direct manufacturing machine, would be useless without at least the steam generator. This, in turn, is materially aided in its operation by the boiler feed pumps and the coal handling equipment. Perhaps the surface condenser and the ash handling machinery are not entirely vital to the process. But they are machinery which materially aids the operator of the plant."

IV. Appellants contend appellee's procedure as to refund does not comply with statute, nor with State Tax Commission rule No. 187, and that we should reverse on that basis.

Section 422.61, subsection 1, is as follows: "The commission shall have the power and authority to prescribe all rules and regulations not inconsistent with the provisions of this chapter, necessary and advisable for its detailed administration and to effectuate its purposes." Section 423.23 makes this applicable to chapter 423.

Rule 187, subsection 6, provides: "* * * where tangible personal property is sold in interstate commerce for delivery in Iowa, it is presumed that the property is sold for 'use' in Iowa and the registered seller is required to collect the use tax from the purchaser. In event the tangible personal property sold for delivery in Iowa is not sold for 'use' in Iowa and, therefore, not subject to the use tax, the seller is required to secure from the purchaser a proper written certificate showing the use to be

made of the property." Subsection 7 provides: "* * * For the purpose of uniformity, the certain forms of certificate are suggested. * * * UT-5 * * * (Industrial materials and equipment)."

■ Appellants complain plaintiff did not secure certificate UT-5 from Farley & Loetscher. As a general administrative measure no doubt the rule is advisable. However, if the industrial plant erected was not subject to use tax under the provisions of statute, the Commission could not under the rule impose the tax, and thus nullify the statute. Kistner v. Iowa State Board of Assessment and Review, 225 Iowa 404, 280 N.W. 587; City of Ames v. State Tax Commission, supra.

■ In accordance with sections 423.23, 422.66 and 422.67, Iowa Code, 1950, plaintiff filed a claim for refund on November 24, 1952, on form UT-513 provided by the Commission for such purpose. This was within one year after the payment. This complied with the following provision in section 422.66: "* * * No claim for refund or credit that has not been filed with the commission within five years after the tax payment upon which a refund or credit is claimed became due, or one year after such tax payment was made, whichever time is the later, shall be allowed by the commission."

The Commission held a hearing on the refund claim in January 1953, and on August 10, 1953, notified plaintiff by registered mail the claim was denied.

On October 7, 1953, and within sixty days, plaintiff filed notice of appeal, which notice was accepted by the chairman of the Commission.

The notice, with return of service, and a petition on appeal was filed in District Court of Polk County on October 17, 1953.

Section 423.16 provides: "* * * the commission shall have the same power [as to use tax] to determine the amount due, as is vested in the commission by sections 422.54, 422.55, and 422.57, subject to all of the provisions, and restrictions, and *rights of appeal* provided in said sections." (Emphasis ours.)

Section 422.55, subsections 1 and 2, provides: "1. An appeal may be taken by the taxpayer to the district court of the county in which he resides, or in which his principal place of business is located [plaintiff's principal Iowa order house was in Des

Moines], within sixty days after he shall have received notice from the commission of its determination as provided for in section 422.54.

"2. The appeal shall be taken by a written notice to the chairman of the commission * * *."

The statute recognizes the possibility of a "mistake." Section 422.66 provides: "Correction of errors. If it shall appear that, as a result of *mistake*, an amount of tax, penalty, or interest has been paid which was not due under the provisions of this chapter, then such amount shall be credited against any tax due, or to become due, under this chapter from the person who made the erroneous payment, or such amount shall be refunded to such person by the commission. * * *." (Emphasis ours.)

Under Morrison-Knudsen Co., Inc., v. State Tax Commission, supra, we have approved the right of a taxpayer wrongfully assessed to secure relief by mandamus procedure. The case involves payment of use tax on construction equipment brought into the state for large improvement projects. We held the use tax had been erroneously assessed and collected. After citing Commercial National Bank v. Board of Supervisors, 168 Iowa 501, 150 N.W. 704, Ann. Cas. 1916C 227, Griswold Land & Credit Co. v. County of Calhoun, 198 Iowa 1240, 201 N.W. 11, and Charles Hewitt & Sons Co. v. Keller, 223 Iowa 1372, 275 N.W. 94, we said at page 46 of 242 Iowa, page 456 of 44 N.W.2d:

"In line with these decisions we now hold the administrative remedy provided by Code section 422.54 (of complaint to the tax commission) is not exclusive where as here, as a result of the commission's mistaken interpretation of the statute, a use tax was paid which was not due under the provisions of the statute. Under such circumstances, by virtue of sections 422.66, 422.67, mandamus lies to compel a refund to the taxpayer."

The trial court in its comprehensive and able opinion stated this action "is in the nature of a mandamus." It has the characteristics of and arrives at the same result as in a mandamus action, but appellee pursued the administrative procedure for refund, which it had the right to do. The record is clear that the provisions of statute were carefully followed.

The judgment and decree of the trial court is affirmed.— Affirmed.

BLISS, WENNERSTRUM, HAYS, and LARSON, JJ., concur.

THOMPSON, J., GARFIELD, C. J., and OLIVER, J., dissent.

LINNAN, J., takes no part.

THOMPSON, J. (dissenting)—I am unable to agree with the reasoning and conclusions reached by the majority and respectfully dissent therefrom.

I. In Division I the majority opinion holds that the property, although brought into Iowa long before April 1, 1949, the date upon which section 2 of chapter 193 of the Acts of the Fifty-third General Assembly became effective, was not delivered to and accepted by the purchaser, the Farley-Loetscher Company, until after that time, and so was not readily obtainable in Iowa before the date named. If it had been delivered here before that date, it would have been readily obtainable under the rules of the Commission then prevailing and under our holding in Peoples Gas & Electric Co. v. State Tax Commission, 238 Iowa 1369, 28 N.W.2d 799.

This holding of the majority is based upon testimony of Robert F. Loetscher, a vice-president of the Farley-Loetscher Company, that "* * * this power plant did not operate, was not accepted by us as purchaser of equipment until July 1949." We said in City of Ames v. State Tax Commission, 246 Iowa 1016, 1023, 71 N.W.2d 15, 20, that "We think it clear that it is the law at the time the property comes to rest in the state and is used here that must govern the question of its taxability."

Section 423.1(1) of the Code of Iowa provides: " 'Use' means and includes the exercise by any person of any right or power over tangible personal property * * *." Even if the property had not been accepted by the purchaser before April 1, 1949, it had come to rest in Iowa and someone was exercising rights and power over it.

Nor can I accept Mr. Loetscher's statement that the property had not been accepted before that date. Bids were called for in November 1945 and the appellee's bid was accepted largely because it was willing to contract for delivery in 300 days. When it was sent into Iowa, "came to rest" here, is not exactly shown, but it was long before April 1, 1949. Conclusive, it ap-

pears to me, is the fact that it was paid for in full long before that date. The total price of the plant was $85,914.58. This was paid by the Farley-Loetscher Company in these amounts and on these dates: July 16, 1947, $5055; September 9, 1947, $63,545.; September 10, 1947, $2200; November 29, 1947, $5852.49; December 6, 1947, $2500; December 31, 1947, $1023.69; and May 22, 1948, $5738.40. There is no record of any agreement that the buyer might refuse the plant after it had been paid for in full; and in view of the fact that it was built on the purchaser's property and open to full inspection by it at all times, I am unable to agree that there was no acceptance by such payment. A purchaser who has property delivered to him and after complete opportunity to inspect it makes full payment will not ordinarily be heard to say that he had not then accepted it.

II. I am also in disagreement with the holding in Division III that this property was "directly" used in the manufacture or processing of tangible personal property intended to be sold ultimately at retail. In the City of Ames case, supra, we held that an electric plant which produced electricity intended to be sold to customers was directly used in such manufacturing or processing. But here the majority goes one step further. The electricity produced by the plant in question was not intended to be sold at retail. It was used to operate other machinery, which in turn produced the manufactured or fabricated product to be sold. The machinery which the electricity operated was directly used in such manner. It is the only machinery "directly" used in the manufacture of the property to be sold. The plant delivered by the appellee here was used only "indirectly" in such manufacture. As we said in Dain Mfg. Co. v. Iowa State Tax Commission, 237 Iowa 531, 538, 22 N.W.2d 786, 791, we cannot ignore the word "directly", which must have been placed in the statute for a purpose.

Exactly in point factually is the case of Jackson Iron & Steel Co. v. Glander, 154 Ohio St. 369, 96 N.E.2d 21. The question involved is stated in the opinion of the Ohio Supreme Court, at page 370 of 154 Ohio St., page 22 of 96 N.E.2d: "The precise question now before the court is whether machinery and equipment purchased for use in mining coal, which coal is not

sold but is later used in the production of pig iron, are used directly in the production of tangible personal property, within the contemplation of the exceptions referred to above." The holding of the court is expressed in this language on page 373 of 154 Ohio St., page 23 of 96 N.E.2d: "In the instant case, it cannot fairly be said that the mining of coal is a direct and integral part of the production of pig iron. Here, there are two distinct activities, namely, mining and smelting, and, although they are related in that mined coal is utilized in the production of pig iron, the two are still separate and distinct operations."

In the Ohio case the machinery was used to produce coal, which in turn was used in the production of pig iron; in the case at bar the equipment is used to produce electricity, which in turn is used in the manufacture of the wood products intended to be sold at retail. Another case directly analogous upon its facts, with a similar holding, is Tulsa Machinery Co. v. Oklahoma State Tax Commission, 208 Okla. 138, 253 P.2d 1067, 1069, 1070.

It is my conclusion that the holding of the trial court should be reversed.

GARFIELD, C. J., and OLIVER, J., join in this dissent.