AMERICAN HOECHST CORPORATION

v.

John H. NORBERG, Tax Administrator.

No. 80–394–M.P.

Supreme Court of Rhode Island.

July 15, 1983.

Hans P. Olsen, Mark A. Dingley, Providence, for petitioner.

Dennis J. Roberts, II, Atty. Gen., Stephen Lichatin, II, Asst. Atty. Gen., Perry Shatkin, Chief Legal Counsel, Marsha McGair Ippolito, Div. of Tax., Providence, for respondent.

## OPINION

KELLEHER, Justice.

This is a certiorari proceeding brought by American Hoechst Corporation (the taxpayer) to contest the assessment of a sale and use tax pursuant to title 44, chapter 18, of the General Laws of Rhode Island on certain supplies utilized in the waste-treatment facility of the taxpayer's manufacturing plant. Specifically, a deficiency in the amount of $29,074.48 plus interest and penalties was assessed on the consumption of electricity, chemicals, and supplies for the period November 1974 through October 1977. On August 13, 1980, the deficiency assessment was affirmed by a justice of the District Court, who rendered a judgment against the taxpayer.

The record certified to us indicates that the taxpayer is the operator of an industrial plant in Coventry, Rhode Island, manufacturing dyes and related products. A brief summary of the taxpayer's plant operation as testified to at the administrative hearing will be helpful in understanding the nature of the controversy before us. In the initial stages of the manufacturing process, certain raw materials are combined with water from the Pawtuxet River to form an intermediate substance. This compound is then consolidated with other materials and water to fabricate yet another substance. The process is repeated with various raw materials as often as is necessary to concoct the desired end product. At that point, the material is placed in drying ovens and then readied for shipment to the taxpayer's customers.

According to the taxpayer's witnesses, waste water is produced at each step in the manufacturing process as the intermediate products are formed. The waste water and resulting sludge is immediately siphoned off to a subsidiary effluent line that eventually merges into a main line carrying effluent from other lines in the manufacturing process. From the main line, the effluent is transported to the waste-treatment facility where it first encounters the neutralization center. Here, certain solids are removed from the waste water in a process referred to as "primary clarification." Following this regimen, the waste water and remaining sludge proceed to biological treatment where they are exposed to activated charcoal filters and aeration pumps that operate twenty-four hours per day, 365 days per year. At the final stage of the treatment process, the water is chlorinated and discharged into the river. We emphasize here that at no point during the various stages of the waste-treatment process are any chemicals or other materials reclaimed for use in the plant operation.

It should be noted that the taxpayer is required by state and federal regulations to maintain the waste-treatment process described above. Indeed, the treatment facilities were designed and constructed in conjunction with the production facility, and if the treatment process were halted, the taxpayer would be forced to cease all manufacturing in the plant. Consequently, the taxpayer maintains that the electricity, chemicals, supplies, and repair parts needed to keep the waste-treatment process operating are exempt under G.L.1956 (1980 Reenactment) § 44–18–30(H), which reads as follows:

"Gross receipts exempt from sales and use taxes.—There are exempted from the taxes imposed by this chapter the following gross receipts:

" * * *

"H. *Purchase for manufacturing purposes.* From the sale and from the storage, use, or other consumption in this state of tangible personal property, electricity, natural gas, artificial gas, steam, refrigeration, and water, when such property or service is purchased for the purpose of being manufactured into a finished product for resale, and becomes an ingredient, component, or integral part of such manufactured, compounded, processed, assembled, or prepared product; or if such property or service is consumed directly in the process of manufacturing for resale tangible personal property, electricity, natural gas, artificial gas, steam, refrigeration, or water, provided, however, that such consumption occurs within one (1) year from the date such property or service is first used or applied in such process of manufacturing.

" 'Consumed directly' means destroyed, used up, or worn out to the degree or extent that such property cannot be repaired, reconditioned, or rendered fit for further manufacturing use.

" 'Consumed directly' shall not mean or include mere obsolescence.

" 'Manufacturing' means and includes manufacturing, compounding, processing, assembling, preparing or producing.

" 'Process of manufacturing' means and includes all production operations performed in the producing or processing room, shop, or plant, insofar as such operations are a part of and directly connected with the manufacturing for resale tangible personal property, electricity, natural gas, artificial gas, steam, refrigeration, or water.

" 'Process of manufacturing' shall not mean or include administration operations such as general office operations, accounting, collection, sales promotion, and experimental work, nor shall it mean or include distribution operations which occur subsequent to production operations, such as handling, storing, selling, and transporting the manufactured products, even though such administration and distribution operations are performed by or in connection with a manufacturing business."

In support of its argument, the taxpayer basically contends that the disputed items are "consumed directly" in its "process of manufacturing" as defined above. The taxpayer emphatically asserts that both practically and legally industrial chemicals cannot be produced for sale without a functioning waste-treatment facility. Unless waste water is discharged as intermediate chemical compounds are isolated, a finished product cannot be manufactured. Relying upon these exigencies, the taxpayer reasons that the waste-disposal facilities naturally constitute "production operations" that "are a part of and directly connected with the manufacturing for resale" of the taxpayer's dyes and chemicals.

■ We begin our analysis of the merits of the taxpayer's arguments by recounting the well-settled principle that we will not engage in fact-finding when reviewing a decision of a tribunal by way of certiorari. We may only inquire whether any competent evidence exists to support the trial justice's decision sustaining the tax administrator's finding that the taxpayer's waste-treatment facility fails to qualify for an exemption under § 44–18–30(H). *See, e.g., Barber v. Exeter-West Greenwich School Committee*, R.I., 418 A.2d 13, 20 (1980); *Great Lakes Dredge and Dock Co. v. Norberg*, 117 R.I. 600, 613, 369 A.2d 1101, 1108–09 (1977).

■ Concerning exemption statutes, we are reminded of the time-honored rule that such statutes are to be strictly construed against the taxpayer and in favor of the public unless by their terms they disclose a clear intention to grant an exemption. *Coachman, Inc. v. Norberg*, 121 R.I. 316, 320–21, 397 A.2d 1320, 1322 (1979). We have previously interpreted the language of

§ 44–18–30(H) and ruled that by its very terms the exemption applies only to property consumed directly in the manufacturing process. *Id.* Unless a contrary intention clearly appears, the words are to be given their plain meaning. *Brier Manufacturing Co. v. Norberg,* 119 R.I. 317, 322, 377 A.2d 345, 348 (1977). We are thus bound by the definitions of the terms in the statute and, in construing them, we cannot interpret or extend the words but must apply them literally. *Id.*

When an exemption is claimed, such as the one in the instant action, the burden is placed upon the claimant to show that it comes within the terms of the statute. *City of Providence v. Killoran,* R.I., 447 A.2d 369, 371 (1982). Neither the tax administrator nor the trial justice was persuaded that the taxpayer met this burden. Applying the guidelines cited above to the facts of this case, we are of the opinion that competent evidence exists in the record to support these rulings.

Counsel for the taxpayer, relying upon the *Regulations and Rules Issued by the Tax Administrator under the Sales and Use Tax Law,* argues that its waste-disposal facility is part and parcel of its manufacturing process. Specifically, counsel states that the treatment facility must be classified under the category of Production in the regulations promulgated pursuant to the Sales and Use Tax Law of January 3, 1977,[1] because it cannot be categorized under the headings of Administration or Distribution. The trial justice referred to this rationale as argument by default. He concluded that the taxpayer's burden was not satisfied merely by showing that the operation was other than administrative. We concur with this conclusion, especially in the light of section 2 of the rules and regulations entitled "Property Used in Production," which reads in pertinent part as follows:

"(H) Tangible personal property, machinery and equipment, *is taxable* and not included in the scope of this exemption if:
(1) Though used or consumed, its use or consumption in relation to the production process is indirect and incidental to that process."

On many occasions we have said that the rules and regulations promulgated by the tax administrator are prima facie evidence of the proper interpretation of the Sales and Use Tax Act. *Herald Press, Inc. v. Norberg,* R.I., 405 A.2d 1171, 1178 (1979); *Coachman, Inc. v. Norberg,* 121 R.I. 316, 321, 397 A.2d 1320, 1322 (1979). Plainly, the interpretation of the statute as set forth in the rules and regulations is that materials not directly used in the production process are taxable. Keeping in mind this interpretation as well as the standards for the construction of exemption statutes set forth above, we find ourselves in agreement with the characterization by the trial justice of the taxpayer's waste-treatment facility as a separate cycle incidental to the manufacturing process. Although there is no question that the disputed items are "consumed directly," they are clearly not so consumed in the manufacturing process as defined by the statute. In support of this line of reasoning, we are particularly persuaded by the undisputed fact that the taxpayer's waste-treatment facility produces absolutely nothing for resale.

The taxpayer naturally attempts to construe the language of the rules and regulations in a light favorable to its position by conversely arguing that the disputed items are not taxable because they are essential to carrying on the production process. However, in our analysis, this argument is not controlling. By way of analogy, the tax administrator points out that the entire plant would become similarly inoperable if, for example, the electricity used for overhead lighting, which is taxable, were cut off at some point. The lighting too can be

---

1. Section 1, pp. 70–71, of the *Regulations and Rules* categorizes the business of manufacturing, converting, compounding, processing, assembling, preparing, or producing into three areas: Administration, Production, and Distribution.

viewed as essential to the taxpayer in the manufacturing of products for resale, but no argument is made that it should be exempt from taxation.

The taxpayer cites cases from other jurisdictions [2] which, counsel argues, support the proposition that pollution-control devices are used directly in the manufacturing process and thus exempt from taxation. In response, we hasten to point out that the language of the statutes involved in those jurisdictions is not exactly the same as the language of our statute and that, in any event, we are not bound by the rulings of those jurisdictions. But more importantly, we think that it is significant that subparagraph P of our statute has exempted pollution-control equipment from taxation since 1966. An amendment in 1980 broadened the exemption to cover pollution-control supplies such as the items in dispute here. Presumably, the taxpayer is presently taking advantage of this exemption. Concerning the effect of this amendment on the taxpayer's contentions to the contrary, we may infer that the Legislature did not intend to exempt pollution-control supplies under subparagraph H of the statute because it only recently decided to amend subparagraph P to reach that result.

In conclusion, our reading of the record convinces us that the taxpayer's waste-disposal facility, although operated contemporaneously with the manufacturing process, is a separate cycle that plays no direct role in that process. It is undisputed that the chemicals, supplies, and electricity purchased for use in the waste-treatment facility are not manufactured into a finished product for resale. Rather, these items are used to eliminate various compounds and polutants from the waste and sludge before being pumped back into the river. Consequently, the waste-treatment cycle does not qualify for an exemption because it fails to meet both the definitional standards outlined above in § 44–18–30(H) and the tests provided in the case law.

The taxpayer's petition for certiorari is denied and dismissed, the judgment of the District Court is affirmed, and the record in the case is remanded to the District Court with our decision endorsed thereon.

2. *See, e.g., Richardson v. State Tax Commission,* 100 Idaho 705, 604 P.2d 719 (1979); *City of Ames v. State Tax Commission of Iowa,* 246 Iowa 1016, 71 N.W.2d 15 (1955); *Department of Revenue v. State Contracting and Stone Co.,* 559 S.W.2d 166 (Ky.Ct.App.1977).