**DART INDUSTRIES, INC.,**
**d.b.a. Tupperware Co.**

v.

**R. Gary CLARK, Tax Administrator, State of Rhode Island Department of Administration, Division of Taxation.**

No. 95–569–M.P.

Supreme Court of Rhode Island.

June 5, 1997.

Everett Hans Lundsten, Elizabeth McDonough Noonan, Providence, for Plaintiff.

Marcia McGair Ippolito, Bernard J. Lemos, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

R. Gary Clark, Tax Administrator for the State of Rhode Island (tax administrator), brought this petition for certiorari, seeking our review of a final judgment of the Sixth Division District Court in favor of the respondent-taxpayer, Dart Industries, Inc., d.b.a. Tupperware Co. (Dart). A District Court judge found that certain of Dart's equipment, including molds used in producing plasticware and equipment used in testing and developing plastic products, qualified for exemptions from Rhode Island's sales-and-use tax because the equipment was used in manufacturing and in research and development. For the reasons that follow, we affirm the judgment of the District Court. The facts and travel pertinent to this case are provided below, with additional facts given as necessary in the legal analysis.

### Facts and Procedural History

The taxpayer, Dart, is a Delaware corporation that manufactures plastic products, primarily kitchenware, sold under the trade name Tupperware. During the time relevant to this case, Dart operated two facilities in North Smithfield, Rhode Island, referred to by the parties as "the Blackstone plant" and "the Great Road plant." The principal function at the Blackstone plant was the testing, modifying, or repairing of molds used in the manufacturing of Tupperware products. Each mold is a 3,000 to 5,000–pound steel block into which liquefied plastic is injected to form a plastic product. Most of the molds were shipped directly from the out-of-state vendor to the Blackstone plant where they were "set up" prior to their use in manufacturing in other states. According to Dart, the set-up of a new mold consists of "preparing a computer tape to program the mold for the desired production cycle and having test runs performed, for which the mold was installed on one of the three mold machines at this location and was used to produce samples." The sample products were not sold but were either recycled or destroyed. A small percentage of the molds was received from out-of-state manufacturing facilities for routine repair and maintenance. The molds

typically remained in Rhode Island for about a month before being sent to manufacturing facilities located in other states. The parties do not dispute that the molds were used in manufacturing in out-of-state facilities, nor do they dispute that salable products using the molds were never manufactured in Rhode Island.

The Great Road plant was devoted primarily to four small manufacturing operations that produced packaging materials, plastic pellets used as a coloring agent, and pastry sheets. The tax-exempt status of the equipment used in these manufacturing activities is not in dispute. The Great Road plant also performed what was alternatively characterized as "research and development" or "quality control."[1] Ralph Belleville (Belleville), a revenue agent for the Rhode Island Division of Taxation (tax division), described the activity at issue as "a type of quality control," involving "testing their own product, * * * testing raw materials, testing competitor's products." In contrast, Frederick Pezzera (Pezzera), a witness for Dart, described the purpose of this activity as "new product development" and the analysis and testing of "new material," not existing materials.

The present controversy began when the Blackstone and Great Road plants were subjected to a routine field audit under the Sales and Use Tax Act, G.L.1956 chapters 18 and 19 of title 44. As a result of the audit, the tax division issued three notices of deficiency against Dart seeking a total of $1,438,387.81 in unpaid taxes, interest, and penalty. At least 90 percent of this amount was attributable to the auditor's determination that the molds that were set up or repaired at the Blackstone plant were subject to the use tax because they did not qualify for a manufacturing exemption. The remainder was derived from an assessment on equipment used to work on the molds in the machine shop at the Blackstone plant and equipment at the Great Road plant for which Dart sought a

research-and-development exemption. Dart conceded liability for a small portion of the assessment.

Dart sought administrative review of the assessment pursuant to § 44–19–17. A formal hearing was held under the Rhode Island Administrative Procedures Act, G.L. 1956 chapter 35 of title 42, on October 18, 1991. In its memorandum to the hearing officer, Dart argued that the molds and the equipment in the machine shop used to work on the molds were entitled to the manufacturing exemption from the sales-and-use tax, § 44–18–30(W) (subsequently amended), and that the equipment used for what Belleville called quality control was in fact research-and-development equipment entitled to the research-and-development exemption from the sales-and-use tax, § 44–18–30(VV) (subsequently amended).[2] On November 24, 1992, the hearing officer issued a decision rejecting Dart's arguments and recommending that the assessment, revised downward to $1,293,659.08 to account for certain errors in the original assessment, be affirmed. The tax administrator accepted the recommendation of the hearing officer and issued a final decision and order dated December 2, 1992, stating that the assessment as revised was correct.

On December 28, 1992, Dart paid the tax division $1,468,767.24, representing the amount of the revised assessment plus statutory interest. One day later, Dart filed an appeal with the Sixth Division District Court, seeking de novo review of the final administrative decision pursuant to G.L.1956 § 8–8–24. A hearing was held on Dart's appeal on June 21, 1995. On September 18, 1995, the District Court judge entered an order reversing the decision of the tax administrator and, in his written decision, found that the molds qualified for the manufacturing exemption and that the equipment for which Dart sought a research-and-development ex-

1. The briefs describe these activities as occurring at the Blackstone location. It appears from the record, however, that the activity claimed by Dart to qualify for the research-and-development exemption occurred at the Great Road plant. In addition, the record suggests that the activity occurred at the Great Road plant in separate

departments with the titles "Research and Development" and "Quality Assurance."

2. The 1995 Reenactment (P.L.1995, ch. 323, § 1) redesignated the manufacturing and research-and-development exemptions as §§ 44–18–30(22) and 44–18–30(43) respectively.

emption did in fact qualify for such an exemption. The decision did not specifically address the machine-shop equipment used to work on the molds but implicitly ruled that such equipment also fell within the manufacturing exemption. The tax administrator petitioned this Court to issue a writ of certiorari to review the District Court decision, and on January 19, 1996, the writ was issued.

### Standard of Review

The General Assembly has directed that each appeal of a final decision of the tax administrator "shall be an original, independent proceeding in the nature of a suit in equity to set aside such final decision and shall be tried de novo and without a jury" in the District Court. Section 8–8–24. *See Owner–Operators Independent Drivers Association of America v. State*, 541 A.2d 69, 73–74 (R.I.1988). A party aggrieved by a final judgment of the District Court in a tax proceeding may petition this Court "for a writ of certiorari to review any questions of law involved. The petition for writ of certiorari shall set forth the errors claimed." Section 8–8–32. Because the quoted language is identical to that providing for certiorari to this Court in administrative matters pursuant to § 42–35–16 of the Rhode Island Administrative Procedures Act, we regard our cases interpreting the scope of our review under § 42–35–16 as applicable in determining the scope of review under § 8–8–32. Therefore, this Court not only addresses alleged errors of law, *New England Telephone and Telegraph Co. v. Clark*, 624 A.2d 298, 300 (R.I.1993); *Rhode Island CATV Corp. v. Clark*, 541 A.2d 462, 464 (R.I.1988), but also "properly includes questions of law involving the applicability of a statute to undisputed facts." *George, Inc. v. Norberg*, 444 A.2d 868, 870 (R.I.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 214, 74 L.Ed.2d 170 (1982). This Court, however, "cannot weigh the evidence to resolve factual disputes." *Kachanis v. Board of Review, Department of Employment and Training*, 638 A.2d 553, 556 (R.I. 1994). Rather, we shall consider only whether the decision under review is affected by error of law or whether legally competent evidence exists in the record to support the findings of the trial judge. *See id.*

### Manufacturing Exemption

The trial judge in this case determined that the molds qualified for the manufacturing exemption from Rhode Island's use tax. The use tax, imposed by § 44–18–20, is a complement to Rhode Island's sales tax, imposed by § 44–18–18. The sales tax applies to "sales at retail in this state." Section 44–18–18. The use tax, in contradistinction, is imposed on "the storage, use, or other consumption in this state of tangible personal property." Section 44–18–20. Although not mutually exclusive,

> "the sales tax generally applies to purchases within the state, and the use tax to purchases which occur out of state but which are in effect 'substitutes' for purchases in this state in the sense that in both cases the property is used in this state. The purpose of a use tax is twofold; to prevent tax avoidance, and to insure that the sales tax will not result in an unfair burden being placed upon the local retailer who must compete with retail dealers in other states who are exempt from the sales tax." *Great Lakes Dredge & Dock Co. v. Norberg*, 117 R.I. 600, 608–09, 369 A.2d 1101, 1106 (1977).

Transactions subject to the use tax are typically also susceptible to the sales tax. *Id.* at 603, 369 A.2d at 1103–04. Double taxation is avoided through various credit and exemption provisions. *See, e.g.*, § 44–18–30A (credit for foreign sales tax or use tax paid); § 44–18–34 (exemption from use tax of property subject to sales tax).

The "storage" of an item that would qualify for a use tax includes "any keeping or retention in this state, except for sale in the regular course of business or for subsequent use solely outside this state, of tangible personal property purchased from a retailer." Section 44–18–9. A "use" subject to the use tax "includes the exercise of any right or power over tangible personal property incident to the ownership of that property, except that it does not include the sale of that property in the regular course of business." Section 44–18–10. Under § 44–18–25, there is a statutory presumption that

"the use of all tangible personal property is subject to the use tax, and that all tangible personal property sold or in processing or intended for delivery or delivered in this state is sold or delivered for storage, use, or other consumption in this state, until the contrary is established to the satisfaction of the tax administrator. The burden of proving the contrary is upon * * * the purchaser."

In the District Court, the burden of production and persuasion in tax appeals "shall fall upon the party seeking affirmative relief," § 8–8–28, in this case, Dart.

 Dart conceded that the property assessed by the tax division was stored or used within Rhode Island and, hence, presumptively was subject to the use tax. Dart argued, however, that the equipment qualified for exemptions from the use tax under § 44–18–30. In respect to the molds, Dart maintained that this equipment qualified for the exemption granted by § 44–18–30(W) for manufacturing machinery and equipment. This subsection, as it existed at the relevant time, exempted from the sales-and-use tax

"the sale and * * * the storage, use, or other consumption in this state of tools, dies, and molds, and machinery and equipment (including replacement parts thereof), used directly and exclusively in an industrial plant in the actual manufacture, conversion, or processing of tangible personal property to be sold, or such machinery and equipment used in the furnishing of power to an industrial manufacturing plant." Section 44–18–30(W)(i).

Our interpretation of the scope of the manufacturing exemption must recognize that statutes that purport to exempt property from taxation "are to be strictly construed against the taxpayer and in favor of the public unless by their terms they disclose a clear intention to grant an exemption." *American Hoechst Corp. v. Norberg*, 462 A.2d 369, 371 (R.I.1983). This rule of strict construction, however, does not permit the frustration of a clear legislative intent to grant an exemption. *Preservation Society of Newport County v. Assessor of Taxes of Newport*, 99 R.I. 592, 596–97, 209 A.2d 701, 704 (1965). But, the burden of proof is on

the taxpayer to establish by competent evidence that it is entitled to an exemption. *Rhode Island Lithograph Corp. v. Clark*, 519 A.2d 589, 591 (R.I.1987).

It is undisputed in this case that the molds were used in Dart's out-of-state manufacturing facilities to manufacture tangible personal property for sale. Instead, the parties' dispute centered on whether the commercial manufacturing process that used the molds had to occur in Rhode Island in order for the exemption to apply. According to the tax administrator, the property must be put "to a qualifying manufacturing activity *while it is present within Rhode Island*"; otherwise the exemption does not apply. According to Dart, the plain language of the statute exempts manufacturing equipment without specifying where the manufacturing occurs. We agree with Dart's interpretation of the statute.

 "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996). Applying this canon of construction to § 44–18–30(W)(i), we conclude that the plain language of the statute provides an exemption from the use tax for manufacturing machinery and equipment without specifying whether the qualifying manufacturing activity must occur in Rhode Island or whether it may take place outside this state. The exemption applies to "the sale and * * * the storage, use, or other consumption *in this state* of tools, dies, and molds, and machinery and equipment (including replacement parts thereof), used directly and exclusively in an industrial plant in the actual manufacture, conversion, or processing of tangible personal property to be sold." Section 44–18–30(W)(i). (Emphasis added.) The tax administrator argued that the phrase "in this state" modifies the words "industrial plant" and "actual manufacture, conversion, or processing." According to the tax administrator, because the industrial plants where the molds were used in manufacturing were located out of state, the exemption did not apply. In our opinion, such a reading of the

statute discounts the placement of the words "in this state." The restrictive modifier "in this state" refers to the preceding phrase "sale and * * * storage, use, or other consumption." Thus, the words "in this state" reiterate the fundamental requirement of the sales-and-use tax, namely, that the taxable event, whether a sale, storage, use, or other consumption, must occur in Rhode Island. *See* § 44–18–18 (sales tax imposed on sales at retail "in this state"); § 44–18–20 (use tax imposed on storage, use, or other consumption of tangible personal property "in this state").

It is the conclusion of this Court that the statute imposes no requirement that this equipment be used in manufacturing activity within Rhode Island. The tax administrator's effort to create such a limitation by reading into the statute a geographical component for the manufacturing use ignores the plain language of the statute, and hence such an interpretation must fail. We therefore conclude that the District Court did not err in reversing that portion of the assessment that was based on Dart's use and storage of the molds in Rhode Island. Because we have resolved this issue in favor of Dart on the basis of statutory construction, we need not consider Dart's contention that the tax administrator's interpretation of the statute, as affording an exemption only if the manufacturing activity occurs in Rhode Island, violates the commerce clause of Article I, section 8, clause 3, of the United States Constitution. We note, however, that a statutory construction that results in facial discrimination against out-of-state commerce "is typically struck down without further inquiry." *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342, 112 S.Ct. 2009, 2014, 119 L.Ed.2d 121, 132 (1992).

The tax administrator also suggested that the incidental use of the molds to produce test samples that were recycled or destroyed removed the molds from the manufacturing exemption that requires the equipment to be used "directly and exclusively" to manufacture "tangible personal

property *to be sold*." [3] Section 44–18–30(W)(i). (Emphasis added.) .According to the tax administrator, because the test samples were not sold, the equipment at issue was not used "directly and exclusively" to manufacture products to be sold and, hence, failed to qualify for the exemption. As the tax administrator acknowledged, however, the tax administrator's own Regulation SU 87–58, lawfully promulgated pursuant to the administrator's rule-making powers under G.L.1956 §§ 44–1–4 and 44–19–33 and in effect at the time relevant to this case, provides that the "[i]ncidental use of production machinery (otherwise qualifying) for the production of samples or promotional materials or other similar products does not disqualify the machinery from the exemption." Regulation SU 87–58 § III. We are of the opinion that the test samples produced during the set-up and repair of the molds fell within this incidental-use exception.

### Machine-shop Equipment

We next consider the assessment on equipment used to test and repair the molds. Dart argued that this equipment was also entitled to the manufacturing exemption from the use tax. The uncontroverted testimony at the administrative hearing was that these items consisted mostly of "parts consumed in the molds," such as screws, taps, and drill bits, as well as some tools used to repair the molds. In her written decision, the hearing officer rejected Dart's claim that these machine-shop items were entitled to the manufacturing exemption. The hearing officer stated:

"Taxpayer also classified other equipment and supplies as manufacturing equipment because the taxpayer believes that the set-up process is a manufacturing process which should be exempt. The machinery and equipment used in the tool room and used in order to set up and modify the molds which are manufacturing equipment are not exempt under the statute because they are not used directly and exclusively

---

**3.** The Legislature has amended G.L.1956 § 44–18–30(W)(i) (now codified as § 44–18–30(22)(i)), effective July 1, 1997, to remove the phrase "directly and exclusively." Public Laws 1996, chapter 253, §§ 2, 3.

in the actual manufacture of anything but, in fact, are used for the modification of manufacturing equipment. Therefore, those items must remain in the measure of tax. There were other mold parts and related items which taxpayer argued should be exempt, but there was no *clear* determination at the hearing or after which items could be shown to be *directly* exempt."

In reversing the tax administrator, the District Court judge did not expressly refer to the machine-shop equipment, but stated that "[c]ertainly the maintenance of the equipment used in manufacturing, and the preparation of that equipment for receipt of raw materials, is part of the 'process' of 'manufacture.'" Because the trial judge vacated the entire assessment, he implicitly reversed the tax administrator's determination that the machine-shop equipment did not qualify for the manufacturing exemption.

As noted *ante*, our review of the District Court's decision is limited to the question of whether legally competent evidence exists in the record to support the trial judge's findings or whether the decision is tainted by error of law. *Kachanis*, 638 A.2d at 556. In this case, there is competent and uncontroverted evidence that the machine-shop assessment was based on "parts consumed in the molds," such as screws, taps, and drill bits, as well as some tools used to repair the molds. Indeed, the tax administrator in his brief described the machine-shop equipment as consisting of "drill bits, taps, dies, burring or texturing tools which are used to repair or alter the molds." We must decide therefore whether items of this nature qualify for the manufacturing exemption.

Section 44–18–30(W)(ii), as it existed at the relevant time, explained in detail the type of activity in which equipment must be directly and exclusively used in order to qualify for the manufacturing exemption. According to this section,

"[m]achinery shall be deemed to be used directly and exclusively in the actual manufacture, conversion, or processing of tangible personal property to be sold only where the machinery is used solely during a manufacturing, conversion, or processing operation (a) to effect a direct and immediate physical change upon the tangible personal property to be sold; (b) to guide or measure a direct and immediate physical change upon the property where that function is an integral and essential part of tuning, verifying, or aligning the component parts of the property; (c) to test or measure the property where that function is an integral part of the production flow or function; (d) to store, transport, convey, or handle the property during the manufacturing, converting, or processing operations heretofore specified; or (e) to place the property in the container, package, or wrapping in which the property is normally sold to the ultimate consumer thereof." [4]

The tax administrator argued that the machine-shop equipment did not fall within any of these five definitions of manufacturing and hence did not qualify for the manufacturing exemption. As support for this position, the tax administrator relied on Regulation SU 87–58 § V(5), which provides:

"Machinery used to any extent by a manufacturer to produce or repair other machinery which in turn is used by such manufacturer to produce tangible personal property for sale is taxable. An example would be a lathe purchased by a manufacturer and used to any extent to produce machinery which is used in such manufacturer's production line."

The tax administrator implied that because the machine-shop equipment was used to "produce or repair other machinery" but was not itself used in manufacturing, it was taxable under this regulation.

■ With regard to the specific machine-shop items in question, however, the tax administrator's position is undercut by Regula-

---

**4.** The Legislature has amended § 44–18–30(W)(ii) (now codified as § 44–18–30(22)(ii)) to eliminate these five requirements. The amended statute, effective July 1, 1997, states that "[m]achinery and equipment and related items shall not be deemed to be used in connection with the actual manufacture, conversion, or processing of tangible personal property * * * to the extent such property is used in administration or distribution operations." Public Laws 1996, ch. 253, §§ 2, 3.

tion SU 87–58 § V(8), which states: "The parts and repair service for exempt machinery also are exempt. Examples of such items would be conveyor belts, grinding wheels, grinding balls, machine drills, auger bits, milling cutters, emery wheels, jigs, saw blades, machine tool holders, reamers, dies and molds." In our opinion, the machine-shop items described before the hearing officer, which included screws, taps, and bits "consumed in the molds," fell within the scope of this regulation and thus qualified for the manufacturing exemption. We therefore hold that the District Court did not err in granting Dart an exemption for this equipment.

### Research–and–Development Exemption

Last, the tax administrator contended that the District Court erred in ruling that certain of Dart's equipment qualified for the research-and-development exemption. Section 44–18–30(VV) exempts from the sales-and-use tax

"the sale and * * * the storage, use, or other consumption of equipment used predominantly for research and development purposes by a qualifying firm. For the purposes of this subdivision, 'qualifying firm' shall mean a business for which the use of research and development equipment is an integral part of its operation, and 'equipment' shall mean scientific equipment, computers, software, and related items." [5]

The parties presented conflicting testimony in respect to the use of the equipment at issue. Belleville, the revenue agent for the tax division, described the contested activity as follows:

"What they were using this equipment for was to evaluate their own product, a type of quality control. They told us that they took pellets or raw materials and they put them in their molding machine and they ran off molds and so forth and they did the same thing to the bowls, they would try to stain them, they would try to get them to burn, they would find out if they were flammable and so forth. Some of this research facility even tested other company's products, like Rubber–Made [sic] Wastebasket or whatever. They would dissect those or try to do things to those to see how good they were to measure their product with a competitor[']s. So, I didn't feel that that was true research and development. I felt it was quality control, that it was testing their own product, that it was testing raw materials, testing competitor's products."

Dart painted a different portrait of its activities. According to Pezzera's testimony at the administrative hearing,

"[w]e have a large emphasis on research and development. Tupperware has always had a large emphasis. The primary function of R & D is to qualify and test new material. There was a—they generally do not test existing materials because, number one, if you're selling to the public and you haven't done your testing of a material before it's qualified, then you could be in for some, you know, a lot of liability. All of the qualifying of material is done previous to production, and then what ends up happening is you have a research and development department and their sole purpose is to qualify new materials. They work with Amocco [sic], they work with Monsanto, universities, and they work with environmental issues, but it is for the development of new process, new materials, you know, testing cycle times and cooling and whatnot."

Pezzera explained that the items claimed for the research-and-development exemption "could be measuring equipment" or "a lens that goes to a particular microscope." He further commented that the research items included prototype aluminum molds used only in developing new materials. In addition, Richard A. Lisec (Lisec), the officer in charge of federal, state, and local taxes for Dart's parent company, testified that the activity in question was treated as research-and-development for federal income tax purposes. According to Lisec, federal regula-

---

**5.** The Legislature has amended § 44–18–30(VV) (now codified as § 44–18–30(43)), effective August 6, 1996, by replacing the words "used pre- dominantly" with the words "to the extent used." Public Laws 1996, ch. 254.

tions governing the credit for foreign taxes require Dart to offset its foreign income by a portion of its domestic research-and-development expenses, thus providing Dart with an incentive "to be as conservative in our definition of research and development as possible."

██ This Court is of the opinion that the testimony of Pezzera and Lisec constituted legally competent evidence in support of the District Court's finding that the equipment at issue was engaged primarily in research-and-development and thus was entitled to the exemption. *Kachanis,* 638 A.2d at 556. Usually, the existence of such evidence would be sufficient to affirm the trial judge's decision, and our review would end here. *Id.* The tax administrator, however, has directed our attention to a regulation, effective during the time of the appeal, that interpreted the phrase "related items" as employed in § 44–18–30(VV) as not including "utilities, intangibles, supplies or items which are expensed rather than capitalized and depreciated on the taxpayer's books." Regulation SU 87–122 § A(3). It is undisputed that at least some of the equipment at issue was charged to Dart's expense accounts and was not capitalized and depreciated as required by the regulation. Indeed, it appears that all the equipment was regarded as constituting expenses for federal income tax purposes.

██ This Court has held that regulations promulgated pursuant to the tax administrator's general rule-making authority under § 44–1–4 have the force of law, *B.G. Bailey Construction Co. v. Norberg,* 524 A.2d 595, 597 (R.I.1987), and are "as binding on a court as a valid statute." *Lerner v. Gill,* 463 A.2d 1352, 1358 (R.I.1983). Moreover, regulations issued under the tax administrator's specific rule-making authority under the Sales and Use Tax Act are prima facie evidence of the proper interpretation of the act, if such regulations are not inconsistent with law and are reasonably designed to carry out the intent and purpose of the act. Section 44–19–33. *The Coachman, Inc. v. Norberg,* 121 R.I. 316, 320, 397 A.2d 1320, 1322 (1979). Such regu-

lations will be declared invalid only when they are "plainly inconsistent with the operative language of the statute." *Brier Manufacturing Co. v. Norberg,* 119 R.I. 317, 323, 377 A.2d 345, 349 (1977).

██ We are of the opinion that the requirement that equipment be expensed rather than capitalized and depreciated is plainly inconsistent with the operative language of the statute, which exempts from the sales-and-use tax "the sale and * * * the storage, use, or other consumption of equipment used predominantly for research and development purposes by a qualifying firm" and defines "equipment" to mean "scientific equipment, computers, software, and related items." Section 44–18–30(VV). It is our opinion that the statute was not intended absolutely to bar "related items" such as Dart's prototype molds that are expensed rather than capitalized. Assuming, without deciding, that the method of accounting may in some cases be a relevant consideration in determining whether a research-and-development exemption applies to specific equipment, we are of the opinion that the equipment at issue in this case should not be denied the research-and-development exemption on the basis of the accounting requirement set forth in the regulation. We therefore affirm the trial judge's determination that the equipment at issue qualified for the research-and-development exemption.

In conclusion, for the foregoing reasons, we deny the petition for certiorari, quash the writ previously issued, and affirm the judgment of the District Court, to which we remand the papers in this case with our decision endorsed thereon.

GOLDBERG, J., did not participate.